[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 2, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16951

_____

D. C. Docket No. 05-00273-CV-HLM-5

RUBY MANN,
as Administrator of the Estate of
Melinda Neal Fairbanks and Guardian of
Haley Nicole Fairbanks, Minors,

Plaintiff-Appellant,

JOHN WILLIAM FAIRBANKS, JR.,
Individually and as Spouse of Melinda Neal
Fairbanks, Deceased,

Plaintiff
Counter Defendant
Appellant,

BRENDA PATTERSON,
Guardian of Jonathan Cody Fairbanks,

Plaintiff,

versus

TASER INTERNATIONAL, INC.,

Defendant
Counter Claimant
Appellee,

HAMILTON HEALTH CARE SYSTEMS, INC.,
d.b.a. Whitfield County Emergency Medical
Services,
JOE BURGE,
SHAWN GILES,
CLAUDE CRAIG,
Individually and in Their Official Capacity as
Deputy Sheriff of Whitfield County,
et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 2, 2009)

Before CARNES, FAY and ALARCÓN,[*] Circuit Judges.

FAY, Circuit Judge:

This action arises out of the death of Melinda Neal Fairbanks following her arrest by deputies of the Whitfield County Sheriff's Office. The administrators of Fairbanks' estate brought a 42 U.S.C. §1983 claim along with various state law claims against the deputies in their official and individual capacities. The administrators also asserted a state law wrongful death claim against Taser International, Inc. and DGG Taser and Tactical Supply Company, the manufacturer

_____

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

and distributor, respectively, of the Taser used by the deputies during Fairbanks' arrest.[1]  The district court granted summary judgment in favor of the deputies and the Taser defendants on all claims.  We affirm.

## I. Facts

At approximately 8:00 a.m., Melinda Neal Fairbanks (Melinda) smoked methamphetamine with her husband, John Fairbanks.[2]  Around 10:00 a.m., the couple drove to Melinda's sister's house to borrow a trailer in order to collect scrap metal and attempt to sell it.  After attaching the trailer, Melinda's sister, Sonya Pamela Neal, accompanied the couple to rental property owned by John's mother, Plaintiff Ruby Mann, where all three began to load scrap metal.

Around 2:00 p.m., Melinda became agitated and delusional.  She began arguing with her husband, whose attempts to placate her were unsuccessful.  After the argument, Melinda entered a neighboring house belonging to Mr. and Mrs. Philips.  Asserting that the home belonged to her, Melinda refused to leave.  At 2:43 p.m., Melinda called 911 from the home, claiming that Mr. and Mrs. Philips were in her home and had stolen her things.

---

[1] Taser: A trademark used for a high-voltage stun gun.  *The American Heritage Dictionary of the English Language* (4th ed.  2000).

[2] Methamphetamine: An amine derivative of amphetamine, $C_{10}H_{15}N$, used in the form of its crystalline hydrochloride as a central nervous system stimulant, both medically and illicitly. *The American Heritage Dictionary of the English Language* (4th ed.  2000).

Melinda then began ransacking the house, throwing household items onto the front lawn and doing extensive damage to several rooms. At this point, Mrs. Philips also called the police.[3] When informed that the police had been called, John fled the scene for fear of being arrested for smoking methamphetamine that morning. Sonya Pamela Neal remained on the scene and tried to convince Melinda to come out of the house.

Responding to the call, Deputies Parker, Giles and Griffin from the Whitfield County Sheriff's Office arrived at 2:56 p.m. The deputies arrived to find Melinda wandering in the backyard and screaming that someone had stolen her things. Specifically, Melinda spoke of the demons and devils who had stolen her treasure. Plaintiffs describe Melinda's agitated state as a case of "excited delirium."[4] Deputy Griffin recognized Melinda from a previous arrest for drugs

---

[3] Operators dispatched deputies to the home after both calls were made.

[4] Although not a validated diagnostic entity in either the International Classification of Diseases or the Diagnostic and Statistical Manual of Mental Disorders, "excited delirium" is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. Carolyn B. Robinowitz, MD, REPORT OF THE COUNSEL ON SCIENCE AND PUBLIC HEALTH 453 (AMERICAN MEDICAL ASSOCIATION, ANNUAL MEETING 2009).

4

and knew that she was a methamphetamine user.

Initially, Melinda cooperated with the deputies. She complied when the deputies told her she was under arrest and asked her to put her arms behind her back. However, when the deputies attempted to handcuff Melinda, she became combative. Melinda began screaming and attempted to kick and "shin scrape" the deputies. She also attempted to head butt the deputies, all the while screaming that someone was trying to "steal her dope."

After the deputies handcuffed Melinda, she continued to resist the deputies as they escorted her to the patrol car. At this point, Sonya Pamela Neal told Deputy Parker that Melinda had mental problems and had stopped taking her medication and needed help. Soon after, Plaintiff Ruby Mann told Deputy Parker that Melinda was sick and needed to go the hospital instead of jail. Both Neal and Mann were told to go back inside the house.

Due to her combative nature, the deputies placed Melinda into the squad car without searching her person. As Melinda was a large woman, the deputies decided to link two sets of handcuffs together to double the length in an effort to make her more comfortable. The set of interlinked handcuffs provided a greater range of motion, which allowed Melinda to reach her pockets. While in the back of the patrol car, Melinda began to dig into her pockets. This movement prompted

5

the deputies to remove her from the patrol car in order to search for weapons or contraband.

Deputies took Melinda out of the back seat and walked her around to the rear of the car. Melinda shouted that they were attempting to plant evidence on her and resisted their efforts. She began slamming her head against the trunk of the car and flailing her body in an attempt to hit, kick, head butt and spit on the deputies.

After the preliminary search, the deputies attempted to place Melinda back into the patrol car. She refused to comply, using her legs to brace herself outside the car. The deputies eventually placed Melinda in the back of the patrol car, where she began to kick uncontrollably. She kicked so forcefully that when the deputies opened the other rear door in an effort to pull her in, she propelled herself out of the open door of the squad car, landing on her head and neck. Since Melinda had landed on her head, Deputy Griffin called Emergency Medical Services (EMS) staffed by Hamilton Healthcare Services as a precautionary measure at 3:19 p.m., stating that Melinda was acting "crazy," and requesting a medical consult.

Melinda continued to kick and fight with the deputies, such that they could only pin her down and wait for backup to arrive.[5] Lieutenant Grant, an officer with

_____

[5] The record is unclear as to when back up was requested. During the course of the arrest, Deputy Burge, Sergeant Craig and Lieutenant Story from the Whitfield County Sheriffs

6

the Varnell Police Department, arrived with leg shackles and placed them on Melinda in an attempt to minimize her kicking. After the shackles were put on, Deputies Giles, Griffin and Parker assisted Lt. Grant in placing Melinda back into the patrol car.

Despite the leg shackles, Melinda continued to kick uncontrollably. Melinda eventually kicked the rear driver's side window out of the patrol car, shattering the glass and bending the steel door frame. Deputy Burge instructed her to stop kicking the badly damaged door, but Melinda refused and continued kicking and slamming her head up against the opposite door.

After issuing this warning to no avail, Deputy Burge discharged his Taser on Melinda three times at approximately 3:35 p.m. The Taser did not have the intended effect and Melinda continued her aggressive resistance. The first discharge momentarily curbed Melinda's behavior. She tightened up and ceased kicking briefly. However, she soon resumed her combative behavior. The second and third discharge had no effect, leading the deputies to question whether the device was working properly. The deputies contend one of the Taser leads came loose while Melinda struggled, likely preventing the Taser from working. Melinda suffered second degree burns to her left breast and injuries to the back of her

_____

Office arrived on the scene, along with Lieutenant Grant, an officer with the Varnell Police Department.

earlobes consistent with the use of a Taser.

At approximately 3:44 p.m., EMS personnel arrived on the scene, but because of her combative nature, they were unable to examine Melinda. They concluded that she was not in any immediate medical distress since she was talking, breathing and responding. Other than having some scrapes on her arm and being dirty and sweaty, Melinda did not appear injured to the deputies or the EMS personnel. The deputies maintain that they believed that the EMS personnel had medically cleared Melinda and she was approved to go to jail. The EMS personnel maintain that they believed Melinda would be transported to the hospital for further evaluation. No explicit orders were given by either the deputies or the EMS personnel.

At approximately 4:00 p.m., the EMS personnel left and Deputy Giles transported Melinda to jail. Melinda continued kicking and screaming during transport. However, approximately thirty seconds prior to their arrival at jail, she stopped kicking and screaming. Deputy Giles reached the jail at approximately 4:10 p.m., and unloaded Melinda, who was unresponsive with labored breathing.

Melinda was attended to by jailers who noted she was ashen and had cuts and bruises on her body. The jailers diagnosed possible heat stroke and took action to cool her down by applying cold compresses. Although the jailers did not

8

believe that Melinda was in danger of dying, her unresponsive state prompted them to call EMS. This was at 4:29 p.m.

EMS personnel arrived at the jail at 4:35 p.m., and transported Melinda to the emergency room, arriving at 5:01 p.m. While at the hospital, Melinda suffered a cardiac arrest at 5:06 p.m., never recovering. Dr. William Oliver of the Georgia State Crime Laboratory conducted an autopsy of Melinda on behalf of the Georgia Bureau of Investigation. Dr. Oliver concluded that the cause of Melinda's death was malignant hyperthermia–specifically, a body temperature in excess of 107 degrees Fahrenheit.[6]

## II. Proceedings Below

The plaintiffs are the administrators of Melinda's estate, the guardians of Melinda's two minor children and Melinda's surviving spouse, John Fairbanks (Plaintiffs). Plaintiffs brought 42 U.S.C. § 1983 claims alleging excessive force, inadequate medical treatment, false arrest and failure to train along with various

---

[6] Malignant hyperthermia is a biochemical chain reaction response commonly triggered by general anesthetics and occasionally triggered by physical stresses such as vigorous exercise and heat. The general signs of the malignant hyperthermia include tachycardia (a rise in heart rate), muscle rigidity and body temperature elevation. Severe complications include cardiac arrest and widespread organ failure. Henry Rosenberg et al., *Malignant Hyperthermia*, ORPHANET JOURNAL OF RARE DISEASES (2007).

9

state law claims against Whitfield County Sheriff Scott Chitwood and Deputies Burge, Craig, Giles, Herren, Parker and Storey (Whitfield Defendants), in their individual and official capacities. Plaintiffs alleged similar inadequate medical treatment claims against the Hamilton Emergency Medical Services (EMS). Plaintiffs also brought a wrongful death claim against Taser International, Inc. and DGG Taser and Tactical Supply Company (Taser Defendants), the manufacturer and distributer, respectively, of the Taser used during Melinda's arrest. Plaintiffs alleged both design defect and failure to warn claims along with a punitive damages claim.

On July 21, 2008, the district court dismissed the Hamilton Emergency Medical Services, with prejudice, based upon a settlement. On November 24, 2008, the district court ruled that Plaintiffs had failed to produce any evidence that the Taser was a "but for" cause of Melinda's death–a necessity under Georgia law–and granted summary judgment for the Taser Defendants. The following day, the district court ruled that Plaintiffs had also failed to establish that the deputies violated Melinda's Fourth or Eighth Amendment rights or that Melinda's death resulted from a policy, practice or custom designed to violate those rights. The court also ruled that the Plaintiffs failed to establish that any spoilation of the evidence resulted from the Whitfield Defendants' bad faith, making an adverse

10

inference against the defendants inappropriate. The district court then granted summary judgment on all remaining claims against the Whitfield Defendants.

Plaintiffs appeal the district court's entry of a final judgment in favor of defendants. Specifically, the Plaintiffs urge: (1) the district court abused its discretion in deeming the defendants' statement of material facts undisputed pursuant to Northern District of Georgia Local Rule 56.1(B)(2)(a)(2); (2) the district court erred in granting summary judgment to the Taser Defendants on plaintiffs' state law negligent failure to warn claim; (3) the district court erred in denying summary judgment on their state law punitive damages claim against the Taser Defendants; (4) the district court erred in granting summary judgment to the Whitfield Defendants on their individual capacity §1983 claims; (5) the district court erred in granting summary judgment to the Whitfield Defendants on the state law claims; (6) the district court abused its discretion in denying their motion for sanctions based upon the spoliation of evidence; (7) the district court abused its discretion in granting the Taser defendants' motion to exclude portions of Plaintiffs' expert witness' second affidavit and in denying the motion to reconsider that ruling; (8) the district court erred in denying their motion to dismiss the Taser Defendants' counterclaim against Plaintiff John Fairbanks for indemnity and contribution; (9) the district court erred in dismissing the guardians' wrongful

11

death claims, asserted on behalf of Melinda's minor children; and (10) the district court erred in denying John Fairbanks' motion to amend the complaint to assert wrongful death claims on behalf of his minor children.

### III. Local Rule 56.1

Plaintiffs challenge the district court's order holding the Whitfield Defendants' Statement of Material Facts undisputed pursuant to Northern District of Georgia Local Rule 56.1(B)(2)(a)(2). Local Rule 56.1 demands that the non-movant's response contain individually numbered, concise, non-argumentative responses corresponding to each of the movant's enumerated material facts. N.D. Ga. R. 56.1(B)(2)(b). Where the party responding to a summary judgment motion does not directly refute a material fact set forth in the movant's Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact pursuant to Local Rule 56.1B(2), such fact is deemed admitted by the respondent. *See Id.*

We give "great deference to a district court's interpretation of its local rules" and review a district court's application of local rules for an abuse of discretion. *Clark v. Housing Auth. of Alma*, 971 F.2d 723, 727 (11th Cir. 1992). In order to meet the abuse of discretion standard, Plaintiffs bear the burden of showing that the district court made a clear error of judgment. *Balogh's of Coral Gables, Inc. v.*

12

*Getz*, 798 F.2d 1356, 1358 (11th Cir.1986) (*en banc*).

Plaintiffs contend their Statement of Material Facts was excluded because of form and not substance. Plaintiffs rely on *Foman* as support that rules of civil procedure should not be construed to avoid decisions on the merits based upon mere technicalities. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.") However, the following paragraph of *Foman* qualifies this sentence as applicable to the denial of a motion to amend without a stated reason. *See id*. *Foman* goes on to state valid reasons for a denial, which include undue delay and "repeated failure to cure deficiencies by amendments previously allowed." *Id*.

Despite their assertions, Plaintiffs failure to comply with local rule 56.1 is not a mere technicality. The rule is designed to help the court identify and organize the issues in the case. *See Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008). Plaintiffs' answers were convoluted, argumentative and non-responsive. Defendants' Statement of Material Facts consisted of 65 paragraphs. Plaintiffs' response consisted of 146 paragraphs, many with multiple subparts. Plaintiffs were on notice of the deficiency and took no steps to make corrections.

13

The district court gave valid, specified reasons for the exclusion of Plaintiffs' answers. As such, Plaintiffs' reliance on *Foman* is misplaced. Plaintiffs have simply failed to show that the district court made a clear error of judgment.

Consequently, "because the non-moving party has failed to comply with Local Rule 56.1–the only permissible way for it to establish a genuine issue of material fact at that stage–the court has before it the functional analog of an unopposed motion for summary judgment." *Reese,* 527 F.3d at 1268. Although the statements contained in Whitfield Defendants' Statement of Material Facts are deemed admitted, this court must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact. *Id*. at 1269. Even in an unopposed motion, the moving party still bears the burden of identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). "That is, the movant is not absolve[d] . . . of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Reese,* 527 F.3d at *1268-69* (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). In accordance with *Reese*, we

14

will confine our review of the record to the materials submitted by the Whitfield Defendants in support of their summary judgment motion. *Reese*, 527 F.3d at 1269 n.26.

## IV. Summary Judgment for Defendants

We review a district court's grant of summary judgment *de novo* considering all the facts and reasonable inferences in the light most favorable to the non-moving party. *See Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar System Inc.,* 541 F.3d 1278, 1287 (11th Cir. 2008). A court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *Nolen v. Boca Raton Community Hosp., Inc.* 373 F.3d 1151, 1154 (11th Cir. 2004). Finally, genuine disputes of facts are "those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

### A. Taser Defendants

Plaintiffs appeal the district court grant of summary judgment on their failure to warn claim. A failure to warn claim derives from tort law. *See Board of Regents v. Canas*, 672 S.E.2d 471, 474 (Ga. Ct. App. 2009). Under Georgia law,

15

"[t]o recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and 'proximate cause' of the injury." *Atlanta Obstetrics & Gynecology Group, P.A. v. Coleman*, 398 S.E.2d 16, 17 (Ga. 1990). "Issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." *Ogletree v. Navistar Int'l Trans. Corp.*, 535 S.E.2d 545, 548 (Ga. Ct. App. 2000). The instant case meets such restrictive criteria.

Georgia law is well-settled that "[t]he defendant's conduct is not a cause of the event, if the event would have occurred without it." *General Motors Corp. v. Davis,* 233 S.E.2d 825 (Ga. Ct. App. 1977) (quoting W. Prosser, [LAW OF TORTS] (4th ed.1971)). The Georgia Supreme Court has held that in medical cases, "reasonable medical probability or reasonable medical certainty" is required to prove causation. *Zwiren v. Thompson,* 578 S.E.2d 862, 867 (Ga. 2003) (rendering a "medical possibility" insufficient for liability under Georgia law).

> Perhaps in the world of medicine nothing is absolutely certain. Nevertheless, . . . it is the intent of our law that if the plaintiff medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment.

*Id*. at 865 (quoting *McMahon v. Young*, 442 Pa. 484, 276 A.2d 534,

16

535 (1971)).  Plaintiffs' own medical expert testified that while it would be naive of him to say that use of the Taser, "didn't contribute in some degree" to Melinda's death, he could not, to a reasonable degree of medical certainty, declare that Melinda would have survived that day but for use to the Taser.

Dr. Gowitt opined in his February 2007 report that Melinda's death was caused by "excited delirium."  Although he suggests a long list of aggravating factors, nowhere does he state that the use of the Taser was a cause or a contributing cause of death based upon reasonable medical certainty.  This was repeated in Dr. Gowitt's deposition of June 27, 2007, wherein he confirmed that in his opinion Melinda's death was caused by "excited delirium."  He also discussed the dangers involved with repeated use of methamphetamine and how that can lead to "excited delirium."  Dr. Gowitt did opine that the use of the Taser probably made the situation worse, but that simply falls short of the requirements of law.

Georgia law is clear that medical causation must come from expert testimony and must provide a causal connection that is "more than a mere chance or speculation" *Anthony v. Chambless*, 500 S.E.2d 402, 404 (Ga. Ct. App. 1998).  Plaintiffs' evidence fails to meet the causation standard required by Georgia law.  Although Plaintiffs correctly contend that there may be more than one cause of an

17

injury, Plaintiffs have provided no admissible evidence to support their claim that use of the Taser caused Melinda's death. Since Plaintiff has failed to make a sufficient showing on an essential element with respect to which they have the burden of proof, summary judgment is appropriate. *See Celotex,* 477 U.S. at 322-23, 106 S. Ct at 2552.

## *Punitive Damages Claim*

A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required. *See Boeing Co. v. Blane Int'l Group*, 624 S.E.2d 227, 231 (Ga. Ct. App. 2005); *D.G. Jenkins Homes, Inc. v. Wood*, 582 S.E.2d 478, 482 (Ga. Ct. App. 2003). Because the court has concluded that Taser Defendants are entitled to summary judgment with respect to all the Plaintiffs' substantive claims, the claim for punitive damages cannot survive.

## B. Whitfield Defendants

### § *1983 Claims*

Plaintiffs make two distinct claims under § 1983 against Deputies Burge, Craig, Giles, Herren, Parker and Storey in their individual capacity;[7] (1) use of excessive force and (2) deliberate indifference to a serious medical need. 42

---

[7] Plaintiffs do not distinguish between the deputies in their claims.

U.S.C. § 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Qualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary authority if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  In order to prevail on a 42 U.S.C. § 1983 claim against a government official acting within his/her discretionary authority, Plaintiffs must show (1) the defendant's conduct violated a constitutional or statutory right and (2) that the right violated was clearly established.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1324 (11th Cir. 2008), *cert. denied*, 129 S. Ct. 104 (2008).

The first inquiry in reviewing Plaintiffs' § 1983 claim, therefore, is to determine whether Plaintiffs have sufficiently alleged a constitutional or statutory violation.  Only if Plaintiffs have adequately alleged such a violation, must the court examine the alleged basis for liability on the part of the deputies. "Without a .

. . violation, there can be no violation of a clearly established right." *Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir. 2003).

*Excessive force*

Plaintiffs contend that the deputies used excessive force against Melinda in violation of the Fourth Amendment.[8] "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). When determining whether the force used to effect a seizure is reasonable for purposes of the Fourth Amendment, a court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Graham v. Conner,* 490 U.S. 386, 396, 109 S. Ct. 1865, 1871 (1989). To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* 490 U.S. at 396, 109 S. Ct. at 1872. Whether the use of force was reasonable must

---

[8] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

be determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Plaintiffs cite *Vinyard* as support for the contention that the deputies were on notice of the unconstitutional nature of their conduct. *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002). *Vinyard* dealt with pepper spraying a detainee whose only offense was the use of foul language directed at the officer. Id. at 1347. *Vinyard* held that "using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Id*. at 1348. But*, Vinyard* continued that "using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." *Id*. Furthermore, *Vinyard* stated that alternative uses of force, such as pepper spray, are a reasonable alternative to escalating a physical struggle with an arrestee. *Id*.

The evidence, when viewed in the light most favorable to Plaintiffs, indicates that the deputies used reasonable force against Melinda. Melinda's actions extended beyond the foul language articulated in *Vinyard*. She actively resisted the deputies' efforts at effectuating a lawful arrest and refused to comply with their requests. Melinda's behavior was violent, aggressive and prolonged and

21

the evidence demonstrates that she was clearly a danger to herself and others.

The nature and quality of the intrusion here, namely use of a Taser, was appropriate given the countervailing government interest of safety and compliance. Deputy Burge warned Melinda to stop her behavior and discharged his Taser only after she refused to comply with the his orders. Her conduct was violent and extended. Given those circumstances, the deputies were justified in the force used against Melinda. No genuine issue therefore remains with respect to Plaintiffs' §1983 excessive force claim.

*Serious Medical Need*

Plaintiffs contend that the deputies were deliberately indifferent to Melinda's serious medical needs by failing to assist the EMS personnel in transporting Melinda to a hospital, by failing to transport Melinda directly to the hospital instead of jail, and by failing to provide Melinda with emergency medical care immediately upon her arrival at jail. As a pre-trial detainee, Melinda's rights exist under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983 (1983). Nonetheless, Plaintiffs' claims are subject to the same scrutiny as if they had been brought as deliberate indifference claims under

22

the Eighth Amendment.[9]  *See Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985) (holding that "in regard to providing pretrial detainees with such basic necessities as . . . medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.")  To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury.  *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer,* 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002).  In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition.  *Hill*, 40 F.3d at 1188-89.  In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

---

[9] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Plaintiffs' contend that Melinda's "excited delirium" presented a serious medical need. We agree. The alternative test set forth in *Hill* states a medical need is sufficiently serious if a delay in treatment worsens the condition, an argument we find applicable here. *Hill*, 40 F.3d at 1188-89. Since the evidence reflects the existence of a serious medical need, the issue then becomes deliberate indifference to that serious medical need.

The Supreme Court has cautioned that not every allegation of inadequate medical treatment states a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105, 106, 97 S. Ct. 285, 291 (1976). "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id*. at 106-107, 97 S. Ct at 292. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* Our circuit has held that, in order to prove that a deputy acted with deliberate indifference, Plaintiffs' must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

24

Plaintiffs assert that the deputies were on notice of Melinda's "excited delirium" and their failure to take her for immediate medical treatment constitutes deliberate indifference. The record, when viewed in the light most favorable to the Plaintiffs indicates that when Deputies Giles, Griffin and Parker arrived, Melinda was agitated and delusional. Plaintiff Ruby Mann and Sonya Pamela Neal both told Deputy Parker that Melinda was sick and needed to go to the hospital. Deputy Griffin had knowledge of Melinda's past methamphetamine use and when Deputy Griffin called EMS, he reported that Melinda was acting "crazy."

While the subjective knowledge of one officer cannot be imputed to other officers, *Burnette v. Taylor,* 533 F.3d 1325, 1331 (11th Cir. 2008), the record indicates that at a minimum, Deputies Griffin and Parker had knowledge of Melinda's disconnect from reality. However, the record clearly indicates that prior to this event, the deputies had no knowledge of the medical condition called "excited delirium" or its accompanying risk of death. Plaintiffs have presented no evidence that indicates that the deputies were aware of the serious risk of harm that a delay in treatment could caused Melinda–an essential element of a deliberate indifference claim.

Prior to her death, Melinda's behavior did not indicate that she had a serious medical need. Her physical resistence and verbal communication suggested to the

25

deputies that although agitated, Melinda was not in immediate medical danger. This was an opinion shared by the EMS personnel. "The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette,* 533 F.3d at 1333; *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (affirming summary judgment for defendant officers and jailers where they did not seek medical treatment for plaintiff who was "obviously . . . intoxicated or under the influence of drugs"). There is no evidence that indicates Melinda's behavior evidenced a serious disease rather than a temporary reaction to the known use of methamphetamine. Most importantly, nothing in the record suggests that the deputies were aware Melinda's condition could lead to death if not promptly treated.

Far from being deliberately indifferent to a serious medical need, the deputies took the precautionary measure of calling EMS after Melinda had fallen out of the patrol car. EMS personnel, medically trained to recognize and diagnose serious medical problems, testified that Melinda did not appear in any immediate medical distress because she was verbally responsive and breathing normally. As such, Plaintiffs' argument that the deputies were deliberately indifferent to Melinda's medical needs is without merit.

26

While the deputies may have made an error in judgment, mere negligence or a mistake in judgment does not rise to the level of deliberate indifference. Plaintiffs' showing that harm resulted, without more, cannot carry the burden required for deliberate indifference. Therefore, under these circumstances, the deputies were not deliberately indifferent to Melinda's serious medical condition when they opted to take her to jail instead of to the hospital. As soon as they realized she needed medical help, they took appropriate action.

*Supervisory Liability*

Plaintiffs also make claims of supervisory liability against Sheriff Chitwood, Deputy Craig and Lieutenants Herren and Story. Taking the Plaintiffs' allegations as true, Lt. Herren was the certified Taser training officer for the Whitfield County Sheriff's Office. Deputy Craig and Lt. Story were the supervising officers on the scene and Sheriff Chitwood was kept apprised of the arrest from his office and refused to intervene.

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dept. of Labor and Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). Supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. *See Lewis v.*

27

*Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (*per curiam*).

The central tenet in both offenses is a constitutional or statutory violation, which we have not found. As such, Plaintiffs' claims under a theory of supervisory liability fail because the underlying §1983 claims fail. *See Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated . . . , Plaintiff cannot maintain a 1983 action for supervisory liability . . . for failure to train").

*Official Capacity*

Plaintiffs make similar allegations against the Whitfield Defendants in their official capacities. A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual. *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (*per curiam*). In response, the Whitfield Defendants assert Eleventh Amendment immunity.

We find it unnecessary to deal with this issue. As set forth earlier, we have found no support for any of the federal claims being made against the Whitfield Defendants in their individual capacities. Consequently, there is no basis and no support for the similar claims made against them in their official capacities.

**State Law Claims**

Plaintiffs appeal the grant of summary judgment to Sheriff Chitwood and

his deputies in their individual capacity on all state law claims. The Georgia Constitution provides, in relevant part:

> [The local government officer] may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Ga. Const. art. 1 § II, ¶ IX(d).

As interpreted, "[t]he 1991 amendment provides no immunity for ministerial acts negligently performed or for ministerial or discretionary acts performed with malice or an intent to injure. *Gilbert v. Richardson*, 452 S.E.2d 476, 483 (Ga. 1994). The question then becomes whether the deputies' actions should be classified as ministerial acts and held to a negligence standard, or as discretionary acts and held to an actual malice standard.

"Whether a duty is ministerial or discretionary turns on the character of the specified act itself." *Reed v. DeKalb County*, 589 S.E.2d 584, 587 (Ga. Ct. App. 2003). A discretionary act "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Teston v. Collins*, 459 S.E.2d 452 (Ga. Ct. App. 1995). In contrast, "[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions

admitted or proved to exist, and requiring merely the execution of a specific duty."
*Standard v. Hobbs*, 589 S.E.2d 634, 636 (Ga. Ct. App. 2003).

Plaintiffs concede that the investigation, arrest and transportation of Melinda were discretionary acts and fall under the actual malice standard. Plaintiffs' main argument is that Sheriff Chitwood and his supervising deputies, Lt. Herren and Lt. Storey, failed to comply with the office's written policies concerning Taser use. Plaintiffs' allege that the mandate to train and supervise Taser use, once adopted by the sheriff's office, became a ministerial function subject to the negligence standard. However, as a threshold to the argument, Plaintiffs fail to address the causation requirement that the alleged failure to train and supervise the use of the Taser caused Melinda's death. As discussed above, Plaintiffs failed to provide evidence that the Taser was the cause of Melinda's death. Therefore, the corresponding claim of failure to train and supervise use of the Taser is without merit.

Plaintiffs' remaining claims deal with the actual arrest and transport of Melinda, which mandate an actual malice standard. "[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999). No evidence indicates that the deputies acted with actual malice towards Melinda. Consequently, official

30

immunity protects Sheriff Chitwood and his deputies with respect to Plaintiffs' state law claims.

**V. Orders**

*Spoliation*

We review the district court's decision regarding spoliation sanctions for abuse of discretion. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 55, 111 S. Ct. 2123, 2138 (1991); *Flury v. Daimler Chrysler Corp*., 427 F.3d 939, 946 (11th Cir. 2005). In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F. 3d 929, 931 (11th Cir. 1997) (*per curiam*).

While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference. *See Id*. Plaintiffs present five instances of alleged spoliation and ask for corresponding sanctions. However, Plaintiffs present no evidence that any party acted in bad faith regarding any of the instances. As such, the district court did not err in declining to draw an adverse inference against the defendants.

*Medical Expert Testimony*

Plaintiffs appeal the district court's ruling that their expert's second affidavit was untimely and did not meet any of the required criteria to excuse the delay. We review for abuse of discretion the district court's decisions regarding the

31

admissibility of expert testimony and the reliability of an expert opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997). Indeed, the "deference that is the hallmark of abuse-of-discretion review," *Id.* at 143, 118 S. Ct. at 517, requires that we not reverse an evidentiary decision of a district court "unless the ruling is manifestly erroneous." *Id*. at 142, 118 S. Ct. at 517 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1879)).

The district court set a March 12, 2007, deadline for the disclosure of expert witnesses and the completion of Rule 26 reports. A Rule 26 report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). Federal Rule 26 correlates with local rule 26.2, which mandates that expert opinions must be disclosed sufficiently early in the discovery period to allow the opposing party to react before the close of discovery, under penalty of exclusion. N.D. Ga. R. 26.2C.

In observing the deadline, Plaintiffs filed a Rule 26 report for Dr. Gowitt on February 23, 2007, setting forth the cause of death as "excited delirium." He explained the relationship between increased catecholamines and an excited delirium state. On June 11, 2008, Plaintiffs filed Dr. Gowitt's second affidavit, asserting two new theories of causation: electrocution and acidosis. The district court excluded their theories relating to acidosis and electrocution, holding that the

32

new theories were untimely and that Plaintiffs did not show the required justification for their failure to disclose this in a timely fashion.

On appeal, Plaintiffs assert that the opinions were disclosed timely. We disagree. Although there were six revised scheduling orders, the opinions and Rule 26 reports of Plaintiffs primary expert were due on March 12, 2007. The six revised scheduling orders dealt with rebuttal experts and specifically excluded previously disclosed experts, including Dr. Gowitt.

In the alternative, Plaintiffs contend that the opinions contained in the second affidavit clarified previous opinions that were submitted timely. Again, we disagree. Dr. Gowitt raises his opinions regarding acidosis and electrocution for the first time in earnest in his affidavit of June 11, 2008. Although Plaintiffs correctly point out that Dr. Gowitt's initial affidavit contained the word acidosis, a plain reading of his affidavit does not put the defense on notice that Plaintiffs would present acidosis as a theory of causation. Dr. Gowitt's sole reference to acidosis was a dismissive sentence, claiming that Melinda's acidosis levels were lower than expected.

Finally, Plaintiffs submit that the electrocution theory was not available until May 2008. In support, Plaintiffs cite a study published in May 2008 which summarizes an emergency room event in which a patient's irregular heartbeat

33

became regulated after an officer deployed a Taser on the patient. Even given a broad reading, that article does not address electrocution as a potential cause of death. Consequently, Plaintiffs have failed to show that their failure to disclose Dr. Gowitt's opinion in a timely fashion was justified.

*Wrongful Death Claims*

Plaintiffs appeal the dismissal of the guardians' claim on behalf of Melinda's children. Plaintiff Ruby Mann, guardian of Melinda's daughter, Haley Nicole Fairbanks, and Plaintiff Brenda Patterson, guardian of Melinda's son Jonathan Cody Fairbanks, brought claims on behalf of the minor children. Hamilton Emergency Services, which was a defendant at that point in these proceedings, filed a motion to dismiss the claims of the children's guardians, which the district court converted into a motion for summary judgment. We review the issue *de novo*, considering all the facts and reasonable inferences in the light most favorable to the non-moving party. See *Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar System Inc.,* 541 F.3d 1278, 1287 (11th Cir. 2008).

The district court held that the guardians' did not have standing to bring an action for wrongful death under Georgia's Survival Action statute, Ga. Code Ann., §51-4-2. Under Ga. Code Ann., §51-4-2(a), "wrongful death claims may be brought by only two categories of Plaintiffs–the decedent's surviving spouse and,

34

if there is no surviving spouse, the decedent's children." *Tolbert v. Maner*, 518 S.E.2d 423, 425 (Ga. 1999). Despite the plain language of the statute, there are narrow exceptions where the courts may exercise equitable powers to allow children with no remedy at law to pursue a wrongful death claim. *See Brown v. Liberty Oil and Ref. Corp.*, 403 S.E.2d 806, 808 (Ga. 1991). However, that power has traditionally been applied where the surviving spouse is absent, disabled, has declined to pursue the claim, or has no relation by blood or law to the surviving children. *See Id.*; *Emory University v. Dorsey*, 429 S.E.2d 307, 309 (Ga. Ct. App. 1993); *Belluso v. Tant*, 574 S.E.2d 595, 598 (Ga. Ct. App. 2002); *Blackmon v. Tenet Healthcare Spalding, Inc.*, 667 S.E.2d 348, 349 (Ga. 2008); *King v. Goodwin*, 626 S.E.2d 165, 166 (Ga. Ct. App. 2006).

Allowing children to proceed is considered a rare exception to the general rule that only a surviving spouse can pursue a wrongful death claim. *See King,* 626 S.E.2d at 166. The district court did not find that this case presented a rare exception to the general rule, but rather that John Fairbanks was ready and able to bring all appropriate claims. We agree. John Fairbanks has a blood relationship with the children, he is present and able to manage the estate of his deceased spouse. As such, the district court did not abuse its discretion in dismissing the guardians' claims.

Plaintiffs also appeal the district court's denial of their motion to amend the wrongful death claim in order to substitute Melinda's children in place of her surviving spouse, John Fairbanks. John Fairbanks attempted to substitute the children for himself when it became apparent that his claim could be reduced by an contribution and indemnity counterclaim due to the fact that he was convicted of criminal solicitation for encouraging Melinda to buying the methamphetamine that they consumed prior to the events proceeding her death. We review a district court's denial of a motion to amend for an abuse of discretion. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); *Jameson, v. Arrow Co.*, 75 F.3d 1528, 1535 (11th Cir. 1996).

As an initial matter, Plaintiffs' motion to amend was untimely. The motion comes long after the deadlines for filing motions to amend established in the scheduling orders entered in this case. Therefore, Plaintiffs were required to show good cause under Federal Rule of Civil Procedure 16(b). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). *See also Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998). The district court found that Plaintiffs did not meet this standard and Plaintiffs have presented no evidence that the district court abused its discretion. Plaintiffs' only argument regarding the denial of the motion to amend is that the

36

district court's decision denied the children's right to a fair trial. This assertion, without any support or discussion, cannot carry the burden required for abuse of discretion.

Finally, Plaintiffs appeal the district court's denial of their motion to dismiss the counterclaim against John Fairbanks for indemnity and contribution. Plaintiffs contend the Georgia Joint Tort-Feasor statute, Ga. Code Ann., §51-12-33, subsumed the indemnity and contribution statute. However, Plaintiffs do not address the threshold issue of timeliness. The district court ruled that Plaintiffs' motion was untimely, and the Plaintiffs have presented no evidence that the district court abused its discretion in making this ruling.

## VI. Conclusion

Although Melinda's death was unfortunate, Plaintiffs have no remedy here. The district court did not abuse its discretion in enforcing its local rules regarding pleadings and motions. Plaintiffs provided no evidence that the deputies used excessive force or were deliberately indifferent to a serious medical need. They were faced with an extremely difficult interaction and handled it appropriately. Therefore, the district court's grant of summary judgment to the Whitfield Defendants was proper. We also hold that Plaintiffs failed to meet the requirements of the law to hold the Taser Defendants liable. Therefore, summary judgment in

37

favor of Taser Defendants was proper.

For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.