[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11201
Non-Argument Calendar
_____

D.C. Docket No. 5:11-cv-00257-RBP-JHE


DANNY WAYNE MOORE,

Plaintiff-Appellant,


versus


ANDY FAURQUIRE,
Superintendent for Alabama Correctional Industries,
COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
MR. MARTIN,
ACI Supervisor,
MR. JOHNSON,
ACI Supervisor,
MRS. BERTINA CARTER,
Warden over Decatur Work Release,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(December 30, 2014)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

In this 42 U.S.C. § 1983 action, plaintiff-appellant Danny Wayne Moore, an Alabama prisoner proceeding pro se, appeals the district court's entry of summary judgment in favor of five defendant-appellee prison officials and employees.  In his second amended § 1983 complaint, plaintiff Moore alleged that he performed certain paint-stripping work on an inmate crew and that the defendants were deliberately indifferent to his health and safety, in violation of his Eighth Amendment rights, by failing to provide him with proper protective gear for his paint-stripping work.  On appeal, Moore argues that the district court erred by granting summary judgment to the defendants.  After careful review, we find no reversible error and affirm.

## I.  BACKGROUND

### A.    The Parties

At all relevant times, Moore was an inmate in the custody of the Alabama Department of Corrections ("Alabama DOC").  Between March 8, 2010 and

2

August 16, 2010, Moore was incarcerated at the Decatur Community Based Facility in Decatur, Alabama.  In his second amended § 1983 complaint, Moore named as defendants: (1) Andy Farquhar,[1] Director of Alabama Correctional Industries ("ACI"); (2) Richard Allen, former Commissioner of the Alabama DOC; (3) Bertina Carter, Warden of the Decatur Community Based Facility; (4) Arthur Martin, ACI Carpenter Supervisor; and (5) Jesse Johnson, ACI Construction Supervisor.

## B.     Paint-Stripping Project, March-May 2010

Because the defendants moved for summary judgment, we present the facts in the light most favorable to plaintiff Moore, construing all reasonable inferences in his favor.  In spring 2010, the construction and remodeling section of ACI, a division of the Alabama DOC, was involved in the Alabama Historical Commission's restoration of the historic Wheeler House near Courtland, Alabama. The project encompassed a two-acre site and involved removing lead-based paint from multiple structures that were more than one hundred years old.  A number of inmate crews were assigned through ACI to work on the Wheeler House restoration project.  Moore worked on the Wheeler House project for a two-month period from March 10, 2010 to May 12, 2010.

---

[1]Although Moore filed his action against "Andy Faurquire," the record indicates that this defendant's last name properly is spelled "Farquhar."

3

All ACI inmates who performed lead-based paint removal work accepted the position voluntarily and were free to change jobs if they felt uncomfortable performing the work. Before starting the work, inmates were required to undergo training and receive certification to perform lead-based paint removal through the University of Alabama's Safe State program. Moore participated in this training on September 23 and 24, 2009 and received his certification at the conclusion of the training. The training covered equipment, chemicals, routine processes, and safety issues involved in lead-based paint removal. Additionally, medical staff examined Moore in that same month and cleared him to wear a respirator, which generally is required to conduct lead-based paint removal.

Defendants Johnson and Martin served as onsite supervisors for the ACI lead-based paint removal project at the Wheeler House. Johnson was certified to supervise lead-based paint removal. Martin did not have supervisory certification but had received a worker-class certification to remove lead-based paint. Johnson and Martin ensured that proper protective gear was onsite for inmate crews and directed the inmates to use the gear for any work involving potential exposure to lead dust or chemicals. Johnson and Martin would reprimand—and terminate, if necessary—any inmate caught not using proper protective gear. Because of the size of the project site, each individual inmate was not directly supervised at all times. Defendant Farquhar, ACI's director, visited the Wheeler House project site

4

on June 2, 2010 and witnessed inmates wearing protective gear while performing paint removal.

In sworn pleadings,[2] Moore alleged that, for a period of one week during his time working on the Wheeler House project, he was forced to apply paint stripper wearing only a flip-down face shield. When he requested a respirator, Johnson and Martin refused and told him that Farquhar would not provide a respirator for that type of work.[3] Moore continued the work without a respirator. To defendant Warden Carter's knowledge, Moore never complained to her or any other Community Based Facility staff concerning his work on the Wheeler House project. There is no evidence that Moore asked to be reassigned to another job.

## C.    Moore's Medical Care, May 2010-May 2013

Moore's prison medical records show the following. On May 12, 2010, Moore reported to the prison infirmary with a "[b]reathing problem," and he returned the next day with nasal drainage and a cough that was producing "[t]hick green stuff." Moore reported that he began experiencing symptoms about one week before reporting to the infirmary. The nurse practitioner diagnosed Moore with hay fever or allergies and prescribed him an antihistamine and nasal spray.

---

[2]We have recognized that, in responding to a defendant's summary judgment motion, facts alleged in an inmate's sworn pleading are sufficient and a separate affidavit is not necessary. See Sammons v. Taylor, 967 F.2d 1533, 1544 n.5 (11th Cir. 1992).

[3]On the other hand, Farquhar attested in an affidavit that sufficient protective gear was available onsite during the Wheeler House project.

5

Six months later, on November 17, 2010, while housed at the Limestone Correctional Facility, Moore was seen at sick call and requested pills for sinus problems. Moore was seen again on February 23, 2011, at which time he complained of allergy-like symptoms, including sneezing and watery eyes, and reported that Zyrtec helped greatly. Moore was diagnosed with allergic rhinitis, and his prescription of Zyrtec was renewed.

On April 15, 2011, Moore submitted a sick call request stating that he was suffering from headaches. Subsequently, Moore scheduled an appointment with a nurse practitioner. The nurse practitioner, Debra Means, saw Moore on April 27, 2011, at which time Moore complained of facial sinus pressure, a headache, and lower back pain. Moore also reported that he earlier had coughed up blood. Moore requested a pain reliever. Nurse Means diagnosed Moore with sinusitis, prescribed him an antibiotic and a sinus spray, and ordered a chest x-ray.

The x-ray of Moore was performed on May 17, 2011 and revealed a "[m]odest right midlung module." Nurse Means then ordered a CT scan of Moore's chest, and Valley Imaging Center in Athens, Alabama performed the CT scan on June 3, 2011. In a report on the scan, Dr. Joseph Cannon noted that Moore had a history of chronic smoking. The scan confirmed the presence of a thirteen-millimeter nodule in Moore's right lung.

6

On August 17, 2011, a cardiothoracic surgeon, Dr. Richard Clay, evaluated Moore and requested that a follow-up CT scan be performed in November 2011 to check for any change in the size of the nodule.[4]  On November 14, 2011, Valley Imaging performed a second CT scan of Moore's chest, which revealed that the nodule was benign, stable, and had not grown in size since the previous CT scan. Dr. Clay saw Moore on November 16, 2011 and ordered a follow-up CT scan in six months.

Valley Imaging performed a third CT scan of Moore's chest on May 1, 2012, which showed that the nodule had not grown or changed.  Dr. Cannon again noted Moore's history of chronic smoking.  On May 9, 2012, Dr. Clay ordered that a follow-up CT scan be performed in one year.  Dr. Clay examined Moore again on May 22, 2013.  Dr. Clay's notes indicate that he recommended a CT scan to watch for pleural thickening but did not recommend a follow-up appointment with his office unless the CT scan revealed changes.

## D.    District Court Proceedings

Liberally construed, Moore's second amended complaint alleged that the defendants were deliberately indifferent to his health and safety, in violation of his Eighth Amendment rights, by failing to provide him with proper protective gear

---

[4]In his sworn second amended complaint, Moore alleged that Dr. Clay told him that his windpipe had shrunk, causing his short-windedness, but his medical records make no reference to any issues with his windpipe.

during the paint-stripping project, which resulted in lung damage, a lump in his lung, bad headaches, short-windedness, and a shrunken windpipe. Moore sought $60,000 in damages for his physical injuries and mental anguish. The defendants filed a special report, arguing that Moore's complaint should be dismissed on multiple grounds. The defendants also filed affidavits, Moore's medical records, and other records related to Moore's lead-based paint removal certification and history of incarceration with the Alabama DOC.

The magistrate judge gave Moore notice that it would treat the defendants' special report as a motion for summary judgment, and Moore filed multiple responses. In one unsworn response, Moore alleged that, during his May 22, 2013 appointment with Dr. Clay, Dr. Clay told him that his exposure to paint stripper caused the nodule to form and was responsible for the "thickening in [his] lung walls." Moore also filed a motion requesting that the defendants produce the medical records of Dr. Clay. The defendants responded by filing Dr. Clay's records of Moore's treatment, noting that they had been unable to obtain an affidavit from Dr. Clay.

The magistrate judge issued a report and recommendation ("R&R") recommending that summary judgment be entered in favor of the defendants because Moore had not presented evidence showing, inter alia, that (1) his use of paint stripper for one week without a respirator posed a substantial risk of serious

8

harm; and (2) the defendants were aware that these conditions created a substantial risk of serious harm and did not take reasonable measures to abate that risk. Additionally, as to defendants Farquhar, Carter, and Allen, Moore's allegation of a single incident in which he was not provided proper safety equipment was insufficient to support supervisory liability. Overruling Moore's objections, the district adopted the R&R, granted summary judgment in favor of the defendants, and dismissed Moore's § 1983 action. Moore timely appealed.[5]

## II.  DISCUSSION

### A.    The Deliberate Indifference Standard

For Moore to secure redress under § 1983, he must demonstrate that the defendants, acting under color of state law, committed acts that deprived him of some right, privilege, or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. The Eighth Amendment's prohibition on cruel and unusual punishment forbids prison officials from exhibiting deliberate indifference to a substantial risk of serious harm to an inmate. See Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974 (1994).

---

[5]We review de novo an order granting summary judgment, considering all the facts and reasonable inferences in the light most favorable to the non-moving party. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To survive summary judgment on his Eighth Amendment claim, Moore must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995). In demonstrating that a condition of his confinement posed a substantial risk of serious harm, the objective component of his claim, Moore must show that the condition was sufficiently serious to violate the Eighth Amendment because it posed an unreasonable risk of serious damage to his future health or safety. Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004). Courts must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36, 113 S. Ct. 2475, 2482 (1993).

To show a prison official's deliberate indifference, the subjective component of Moore's claim, Moore must demonstrate: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Thomas v. Bryant, 614 F.3d 1288, 1312 (11th Cir. 2010). The defendants must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979. The defendants may escape liability

10

for known risks "if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844, 114 S. Ct. at 1982-83.

## B.    Moore's Claim of Deliberate Indifference

We conclude that Moore has shown no reversible error in the district court's grant of summary judgment.  Moore failed to raise a genuine issue of material fact with regard to the objective component of his deliberate indifference claim.  Specifically, he presented no evidence that applying paint stripper with only a face shield for one week created a substantial risk of serious harm to his health or safety.  See Chandler, 379 F.3d at 1289.  Although Moore asserted that this exposure to the paint stripper caused various health problems, including a nodule in his lung, his medical records contain no evidence that such a limited exposure to the paint stripper was capable of causing these types of health problems or the nodule.[6]  Indeed, the only suggestion in Moore's medical records of a possible

---

[6]While causation is a separate element of Moore's deliberate indifference claim, see Hale, 50 F.3d at 1582, the issue of whether his exposure to paint stripper likely could cause health problems also comes into play as to the objective component of his claim because the objective factor allows a court to consider, among other things, a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [a substance]."  Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (quoting Helling, 509 U.S. at 36, 113 S. Ct. at 2482) (quotation marks omitted).  In Kelley, we reasoned that the plaintiff-prisoner had failed to meet the objective component of his deliberate indifference claim in part because he had "offer[ed] no evidence to show that his headaches were causally linked to his exposure to [environmental tobacco smoke]."  Id. at 1285.

cause of his respiratory issues is the repeated notation that he was a chronic smoker.[7]

Even if a jury reasonably could infer that the limited exposure to the paint stripper was capable of causing health problems like Moore's, Moore has not shown that the limited paint stripper exposure here caused his problems or an issue of fact as to causation.  See Hale, 50 F.3d at 1582.  Although medical records confirm that Moore has a thirteen-millimeter nodule on his right lung, multiple CT scans over the course of about a year show that the nodule is benign and stable in its size and condition.  The medical records contain no evidence of causation between the paint-stripping and the nodule.

Even if Moore could satisfy the objective factor of his claim, he would fail on the subjective component because he has failed to raise a genuine issue of material fact regarding whether the defendants were deliberately indifferent.  The undisputed evidence shows that the defendants responded reasonably to the risks posed by the Wheeler House restoration project by arranging training for inmate

---

[7]On appeal, Moore argues that the defendants failed to produce the records from his May 22, 2013 appointment with Dr. Clay, in which Dr. Clay allegedly indicated that Moore's nodule was caused by his exposure to lead-based paint and paint stripper without proper protection.  However, this assertion is belied by the record, as the defendants did in fact file a May 22, 2013 report by Dr. Clay concerning his appointment with Moore, and the report contains no such indication as to the cause of Moore's respiratory issues.  Moreover, although Moore claimed in one of his responses to the defendant's special report that Dr. Clay told him during the May 22 appointment that exposure to the paint stripper caused his nodule, this pleading was unsworn.  See Nicholson v. Ga. Dep't of Human Res., 918 F.2d 145, 148 n.1 (11th Cir. 1990).

workers on lead-based paint removal; providing supervision of the inmate workers by individuals trained in lead-based paint removal; and generally making protective gear available during the project. See Farmer, 511 U.S. at 844, 114 S. Ct. at 1982-83. And even accepting Moore's allegation that during one week of two months the defendants gave him only a face shield and not a respirator, he has pointed to no evidence that the defendants were aware that applying paint stripper for a brief period of only one week without a respirator posed a substantial risk of serious harm. See Thomas, 614 F.3d at 1312.

Because we conclude that Moore has failed to create a genuine issue of material fact as to whether he suffered a violation of his constitutional rights, we decline to consider the district court's additional finding that Moore did not show supervisory liability with regard to defendants Farquhar, Carter, and Allen. See Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999) (stating that a claim for supervisory liability fails where there is no underlying constitutional violation).

## IV. CONCLUSION

For the above reasons, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

13