[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-11842

_____

JOHN DAVID WILSON, JR.,

Plaintiff-Appellant,

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,
WARDEN, (Respondent Superior), Warden, ZCI,
T. VANANTWERP, Law Librarian, Mail Room Supervisor,
CORIZON HEALTH CARE SERVICES,
Prisoners Health Care Provider, et al.,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:15-cv-01207-CEH-AAS

————————————

Before BRANCH, GRANT, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

Since 1873, Congress has protected veterans' benefits from claims by creditors, tax authorities, and even judicial orders. *See Porter v. Aetna Cas. Co.*, 370 U.S. 159, 160 n.2 (1962) (collecting the various statutes Congress enacted to protect veterans' benefits). Those protections are presently codified in 38 U.S.C. § 5301, which provides, in part, that VA benefits "due or to become due . . . shall not be assignable . . . shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary."

John Davis Wilson Jr., a veteran currently imprisoned by the state of Florida, sued prison and state officials under 42 U.S.C. § 1983, alleging that they violated his rights under § 5301 by taking his VA benefits from his inmate account to satisfy liens and holds stemming from medical, legal, and copying expenses he had incurred in prison. Wilson also sought to enjoin a Florida administrative rule requiring that inmates have their VA benefits

sent directly to their inmate accounts for prison officials to honor the funds' protected status, which Wilson contended violates § 5301, thereby running afoul of the Supremacy Clause of the United States Constitution.

Wilson claims that prison officials violated § 5301 in two ways. Initially, Wilson had the VA send his benefits to an outside credit union, which would then transfer the funds into his inmate account. Prison officials placed liens on Wilson's inmate account and satisfied them with the funds transferred from the outside account, which included VA benefits. Second, Wilson subsequently directed the VA to send his benefits directly to his inmate account. After Wilson requested copies of medical records, he signed an inmate payment form authorizing payment for those copies from his inmate bank account. Because his inmate account was nearly empty, prison officials placed a "hold" on the account.[1] After his VA benefits were deposited directly into the account, prison officials paid Corizon Health for the requested copies with those funds.

After dismissing some of the defendants, the district court granted qualified immunity to those remaining. It also found that Wilson lacked standing to challenge Florida's administrative rule directing inmates who receive VA benefits to have the VA send

---

[1] A hold is satisfied when sufficient funds become available in the inmate account regardless of whether those funds contain VA benefits.

4                    Opinion of the Court                    18-11842

payment directly to the inmate's prison account or risk losing their funds' exempt status because he failed to allege sufficiently a threat of future injury.

After careful consideration and with the benefit of oral argument, we agree that the prison officials are entitled to qualified immunity for the alleged violations of § 5301 and that Wilson lacks standing to challenge Florida's administrative rule. Accordingly, we affirm.[2]

## I.      Background

### (a) Factual Background

Wilson is a Florida inmate and veteran who receives monthly VA disability benefits. Before August 2012, the VA would send Wilson's disability benefit payment to his account at Navy Federal Credit Union, which, at Wilson's direction, would then issue and mail checks to the Florida Department of Corrections's ("DOC") Inmate Trust Fund address, at which point prison officials would deposit the checks in Wilson's inmate account.

Before August 2012, the DOC put multiple liens on Wilson's inmate account for medical copayments and legal copying services.[3] Prison officials then collected on the liens with the funds

---

[2] Wilson's appeal presents various other issues, but, as explained below, our decisions on qualified immunity and standing resolve the appeal.

[3] An account supervisor at the DOC attested that the prison applies liens to the accounts of inmates receiving VA benefits. Unlike a hold—which is automatically satisfied when sufficient funds become available—a lien is not

sent to Wilson's inmate account from the credit union, not realizing the money consisted of VA benefits.

In November 2011, Wilson filed a written grievance with the DOC asserting that prison officials used his VA benefits to satisfy liens on his inmate account "in violation of" 38 U.S.C. § 5301, which provides, in relevant part, that

> [p]ayments of benefits due or to become due under any law administered by the Secretary shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary. The preceding sentence shall not apply to claims of the United States arising under such laws nor shall the exemption therein contained as to taxation extend to any property purchased in part or wholly out of such payments.

38 U.S.C. § 5301(a)(1). The DOC responded in writing to Wilson's grievance by acknowledging that VA benefits are exempt from attachment, levy, or seizure under federal law, but claiming that Wilson's "veterans benefit checks ha[d] not been touched." Wilson appealed this denial to Julie Jones, the Secretary of the Florida

automatically satisfied because of the risk that some (or all of) the now-available funds are protected VA benefits.

6                    Opinion of the Court                18-11842

Department of Corrections (the "Secretary"). The Secretary denied the appeal, explaining that "VA checks must be directly deposited into your [inmate] account in order to be considered VA payments." In denying Wilson's appeal, the Secretary relied on Florida Administrative Code Rule 33-203.201(2)(b), which provides that,

> [i]n accordance with 38 U.S.C. 5301, Veterans Administration (VA) benefit checks are exempt from attachment, levy or seizure. The Department shall not deduct payments for liens on the inmate's trust fund account for medical co-payments, legal copies, or other Department generated liens from VA benefits checks *mailed directly* to the Bureau of Finance and Accounting, Inmate Trust Fund Section, Centerville Station, P.O. Box 12100, Tallahassee, FL 32317-2100.

Fla. Admin. Code Ann. r. 33-203.201(2)(b) (the "Florida Direct Deposit Rule") (emphasis added).

Following the denial of his administrative appeal, Wilson directed the VA to mail his benefits to the address associated with his inmate account. Consequently, Wilson had two addresses on file with the VA—one for his VA benefit checks at the Inmate Trust Fund department and another for all other VA correspondence at his prison. He claims, however, that because he had two addresses, the VA mistakenly sent correspondence to the address associated with his inmate account in the spring of 2013 and that the ensuing

confusion caused him to miss unspecified deadlines and receive several disability checks months late.

Despite Wilson's initial issues with receiving mail, the new arrangement appeared to work for a couple of years. But on February 20, 2015, Wilson signed an "Inmate Payment Agreement for Copy of Protected Health information" authorizing the DOC to "bill [his] account" for $37.95 for "a copy of [Wilson's] mental health record," and indicating that he had "requested" the copy. At the time, Wilson's inmate account had a $0.03 balance, and, on March 4, 2015, prison officials placed a hold on it to pay for the medical copies. On April 14, 2015, eight days after Wilson received his monthly VA benefits, $37.95 was paid from his inmate account to Corizon Health, a private subcontractor for the prison.

After these funds were removed from his account, Wilson filed multiple grievances, complaining that Corizon Health unlawfully seized his VA benefits and seeking the return of the $37.95 that had been extracted from his account. The prison responded to one of his grievances by requesting additional documentation. Instead of providing it, Wilson appealed the prison's response to the Secretary's office, which subsequently denied his appeal because "[t]he withdrawal was done at [Wilson's] request."

### (b) Procedural History

On May 15, 2015, Wilson filed this § 1983 action in federal court, asserting that Florida officials and Corizon Health violated

his constitutional rights under the Fourteenth Amendment by seizing his VA benefits in violation of 38 U.S.C. § 5301.  In his amended complaint, Wilson asserted claims against the prison warden, the prison law librarian, the prison mail room supervisor, Corizon Health, Secretary Jones, and then-Attorney General of Florida, Pam Bondi.  Wilson alleged that the defendants violated 38 U.S.C. § 5301 by seizing his VA benefits to pay for, among other things, legal and medical copying services and medical copayments.  He sought "return of all seized funds" derived from his VA benefits, appointment of counsel, litigation costs and attorney's fees, nominal damages for emotional injury, and to enjoin the Florida Direct Deposit Rule to the extent it exempts from seizure only VA benefits mailed directly to a prisoner's inmate account.

The district court *sua sponte* dismissed Attorney General Bondi as a defendant.  Wilson then filed a motion for summary judgment, describing (for the first time) the harm caused by keeping two mailing addresses with the VA—namely that he missed important correspondence and received VA checks late.  The district court struck the "premature" motion for summary judgment because the defendants had not yet had a chance to conduct discovery, let alone respond to the amended complaint.

Corizon Health then filed a Rule 12(b)(6) motion to dismiss, arguing that Wilson failed to state a claim against it because the Florida DOC—not Corizon—seized the money from Wilson's inmate account to pay for his $37.95 in copying costs.  In response,

Wilson pointed to his inmate account statement, which listed Corizon Health as the "payee" of the $37.95 withdrawn from his account.

Secretary Jones, the prison warden, and the law librarian also moved to dismiss Wilson's action under Rule 12(b)(6), contending, in part, that the warden was not liable as a supervisor because respondeat superior liability is unavailable in a § 1983 action; that the statute of limitations barred claims for reimbursement of funds extracted from Wilson's inmate account to satisfy liens before May 19, 2011; that the defendants were entitled to "Eleventh Amendment immunity" to the extent Wilson sought money damages from them in their official capacities; and that the defendants were entitled to qualified immunity from damages in their individual capacities.

In a consolidated order, the district court granted Corizon's motion to dismiss without explanation. It also granted, in part, the other defendants' motion to dismiss, finding that: (1) Wilson "failed to allege any facts showing a causal connection between the warden and the alleged violations"; (2) Wilson's claims arising before May 15, 2011 (the day Wilson filed his initial action in this case), were barred by the statute of limitations; (3) the Eleventh Amendment barred Wilson's monetary claims against the defendants in their official capacities; and (4) the defendants were entitled to qualified immunity for withdrawing funds from his prison account to satisfy liens before August 2012, and for withdrawing $37.95 from Wilson's account on April 14, 2015, to

satisfy the account hold because "the court cannot say that defendants were plainly incompetent or knowingly violated 38 U.S.C. § 5301." However, the district court found that the defendants failed to address Wilson's contention that the Florida Direct Deposit Rule conflicted with 38 U.S.C. § 5301 and allowed Wilson to proceed against Secretary Jones on that claim only.

Secretary Jones subsequently moved for summary judgment, arguing that Wilson lacked standing to challenge the Florida Direct Deposit Rule because the VA was now sending his benefits directly to his inmate account (and hence, the benefits were protected under the regulation), and that, in any event, the rule was consistent with § 5301 and was not invalid under the Supremacy Clause of the U.S. Constitution. Wilson disagreed, contending that he had missed deadlines and correspondences in the past because of his dual addresses, and that he was likely to face similar harm in the future. The district court agreed with the Secretary that Wilson lacked standing and granted her motion for summary judgment. Wilson timely appealed.[4]

## II.    Discussion

### (a) Qualified Immunity

---

[4] On appeal, Wilson does not contest the district court's determination that "to the extent [Wilson] seeks monetary damages against Defendants in their official capacities, his claim for monetary damages is barred by Eleventh Amendment immunity." In addition, Wilson does not challenge the district court's dismissal of Attorney General Bondi as a defendant.

On appeal, Wilson challenges the district court's conclusion that the Florida officials were entitled to qualified immunity for withdrawing funds from his prison account to satisfy liens before August 2012, and for withdrawing $37.95 from Wilson's account on April 14, 2015, to satisfy the account hold. "We review *de novo* a district court's decision to grant or deny the defense of qualified immunity on a motion to dismiss, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Davis v. Carter*, 555 F.3d 979, 981 (11th Cir. 2009).

As an initial matter, the parties do not dispute that § 1983 provides a means for Wilson to enforce § 5301 against the state and that the prison officials here acted within the scope of their discretionary authority.[5]    Therefore, we turn to whether the Florida defendants are entitled to qualified immunity. Because the defendants were acting within the scope of their discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *See Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (quotation omitted).

---

[5] We note that the parties dispute whether the prison warden has supervisory liability for the prison officials' conduct in connection with Wilson's VA benefits. As explained in more detail below, because we conclude that, even if the warden was vicariously liable for the other officials' conduct, she would be entitled to qualified immunity, we do not address the supervisory liability issue.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official enjoys qualified immunity unless: (1) the plaintiff alleges facts establishing that "the defendant's conduct violated a constitutional or statutory right"; and (2) the violated right was clearly established at the time of the defendant's alleged misconduct. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009). We have discretion in deciding which of these two prongs to address first "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. While some courts might find it beneficial to analyze these elements in sequence, *see, e.g., Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009), it is not necessary to decide both prongs where it is plain that the right is not clearly established, *Pearson*, 555 U.S. at 236–37. That is the case here. The statutory right that Wilson alleges has been violated was not clearly established.[6] Accordingly, we begin with the second prong.

---

[6] Our colleague in dissent agrees with our ultimate conclusion that defendants are entitled to qualified immunity—but for a different reason. We conclude that defendants are entitled to qualified immunity because the right at issue was not clearly established. In the dissent's view, however, defendants are entitled to qualified immunity "[b]ecause the officials were not aware that they were handling VA benefit money."

The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), overruled on other grounds by *Pearson*, 555 U.S. at 236. We therefore confine our inquiry to "the facts that were knowable to the defendant officers" at the time they engaged in the conduct at issue. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam). "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017). Accordingly, government officials "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *See Butz v. Economou*, 438 U.S. 478, 507 (1978).[7]

A plaintiff can show that a right is "clearly established" for qualified immunity purposes in three ways: (1) pointing to a "materially similar case" decided by the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court that clearly establishes the statutory right, *see Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (quotation omitted); (2) showing that "a

---

[7] The Supreme Court stated this rule in connection with the mistakes of "[f]ederal officials," but it applies to state officials just the same. *See Pearson*, 555 U.S. at 231 (noting, in a case involving state officials, that "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact" (quotation omitted)).

broad statement of principle within the Constitution, statute, or case law . . . clearly establishes [the] constitutional right"; and (3) demonstrating that the defendants engaged in "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law," *Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015).

As we explain further below, the officers are entitled to qualified immunity on both of Wilson's claims, albeit for different reasons.

### 1.  The pre-August 2012 liens

Wilson argues that his rights were "clearly established" by the text of 38 U.S.C. § 5301, as interpreted by the Supreme Court in *Porter v. Aetna Casualty Co.*, 370 U.S. 159 (1962).[8]   The defendants respond that *Porter* was insufficient to put officials on notice because it did not involve funds deposited first into an outside bank account and later transferred to a prison inmate account.

For the reasons explained below, we hold that the defendants are entitled to qualified immunity for their debiting of Wilson's inmate account to satisfy liens prior to August 2012

---

[8] In *Porter*, the Supreme Court explained that the test to determine whether VA funds retain their exempt status is "whether as so deposited the benefits remained subject to demand and use as the needs of the veteran for support and maintenance required" and "actually retain the qualities of moneys, and have not been converted into permanent investments." *Id.* at 161–162.

because he has failed to show that the officials violated his "clearly established" rights under § 5301.

The statute at issue—38 U.S.C. § 5301(a)(1)—sets forth a clear rule: VA benefits "due or to become due . . . shall not be assignable . . . and such payments . . . shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure . . . ." Under this provision, VA benefits are neither assignable nor subject to seizure or attachment, even before the veteran receives the funds. The statute does not, however, tell us what happens to VA funds' exempt status after they are deposited into an account or transferred between a series of accounts.

The Supreme Court subsequently addressed one aspect of this open question in *Porter*. *See* 370 U.S. at 161. In *Porter*, the plaintiff's VA funds were deposited into a federal savings and loan association account that had various restrictions associated with it, including a 30-day demand requirement for withdrawing funds. *Id.* at 159–61. Holding that the VA funds retained their exempt status after being deposited in the account, the Court stated that the relevant test is: "whether as so deposited the benefits remained subject to demand and use as the needs of the veteran for support and maintenance required." *Id.* at 161 (citing *Lawrence v. Shaw*, 300 U.S. 245 (1937)). The Court explained that VA benefit funds are protected "regardless of the technicalities of title and other formalities" if they "are readily available as needed for support and

maintenance, actually retain the qualities of moneys, and have not been converted into permanent investments." *Id.* at 162.

To be sure, like *Porter*, this case involves the deposit of VA funds into an account, where they do not lose "the qualities of money" and are not "converted into permanent investments." *See id.* at 162. But *Porter* focused on whether, under the Supreme Court's precedent, VA benefits lose exempt status after a veteran places them in a certain type of savings account (*i.e.*, a savings and loan account with specific withdrawal requirements). It did not address what happens when VA benefits are transferred between two accounts, arriving in the second one as a "money order" or credit union check with no indication that VA benefits were included.[9]

Because the text of § 5301 does not address this situation and Wilson has not pointed us to any "materially similar case" from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, he has failed to show that his rights under the statute were "clearly established" when prison officials satisfied

---

[9] As discussed above, before August 2012, Wilson's VA benefits arrived at the prison in the form of a credit union check or money order, and the inmate account statements for the relevant period merely list the deposits as "Money Order" and name the "remitter/payee" as "Wilson, John," "Navy Federal," or "Unknown." The record before us contains no copies of the credit union checks, and, consequently, we cannot know whether they listed "VA benefits" or something similar on the memo line. Instead, there is nothing in the record to indicate that a reasonable prison official would have known that the credit union checks contained VA benefits.

liens on his inmate account with VA funds transferred from the outside credit union.[10]

---

[10] Our dissenting colleague disagrees that § 5301 "did not protect" Wilson's VA funds "in the first place." The dissent emphasizes that the funds deposited in *Lawrence* were labelled "deposits in bank," and thus "facially nondescript bank deposits made up of VA funds are exempt under § 5301" despite lacking any indication that such funds were VA benefits. Accordingly, "[l]abeling does not matter." The dissent contends that we are wrong to consider the significance of the transfer of funds because, under *Lawrence*, "however VA funds are stored, they are protected" so long as "they remain 'subject to demand and use as the needs of the veteran for support and maintenance require[].'" The result, according to the dissent, is that § 5301 protects Wilson's benefits despite the transfer of the VA funds from one account to another because "all that transfer did was make the VA funds nondescript . . . just like in *Lawrence*."

Indeed, we seem to agree that if the question at issue were whether § 5301(a)(1) applies to an inmate checking account, such as Wilson's, *Lawrence* and *Porter* would certainly answer "yes." However, *Lawrence* and *Porter* leave open the operative question in this case; namely, whether it was clearly established that unmarked funds transferred between liquid accounts retain their protected status after the transfer so as to foreclose the availability of qualified immunity to the defendants in this case.

Because *Lawrence* and *Porter* are silent on this issue, they are not "materially similar" to this case and, accordingly, cannot "clearly establish" Wilson's rights under § 5301. *See Echols*, 913 F.3d at 1324; *Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015) (identifying "case law with *indistinguishable facts*" as a means of showing clearly established law) (emphasis added) (quotation omitted)); *see also City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").

Wilson contends, however, that he can still show that his rights were "clearly established" because § 5301(a)(1) applies with "obvious clarity" to his case.  It is true that a right may be "clearly established" even in the absence of on-point case law.  "General statements of the law . . . are not inherently incapable of giving fair and clear warning."  *United States v. Lanier*, 520 U.S. 259, 271 (1997).  Therefore, in some instances, a rule "already identified in the decisional law may apply with *obvious clarity* to the specific conduct in question, even though the very action in question has not previously been held unlawful" in a judicial decision.  *Id.* (quotation omitted) (emphasis added).[11]  Obvious clarity is a "narrow exception," however, *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002), and such cases "will be rare," *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc).

Wilson's argument centers on language in § 5301(a)(1) exempting VA benefits from "attachment, levy, or seizure," which he says applies with "obvious clarity" and renders his rights "clearly established."  We disagree.  Wilson's obvious clarity argument fails because the officials had no way of knowing that the funds transferred into Wilson's inmate account from the credit union were VA benefits.  The Supreme Court has repeatedly made clear that officials "will not be liable for [a] mere mistake[] . . . of

---

[11] We also use the "obvious clarity" descriptor for cases where a right is clearly established because the conduct involved "so obviously violate the constitution that prior case law is unnecessary." *See Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (2017) (quotation omitted).

fact . . . ." *See Butz*, 438 U.S. at 507. And confining our inquiry to "the facts that were knowable to the defendant officers," as we are required to do, *see White*, 137 S. Ct. at 550, we cannot say that § 5301(a)(1) applies with "obvious clarity" to a situation where a reasonable person would not have known VA benefits were implicated.

In sum, Wilson has failed to show that officials violated a "clearly established" right under § 5301 when they withdrew the VA funds transferred from Wilson's credit union account to his prison account to satisfy liens before August 2012. Accordingly, the officials are entitled to qualified immunity.

### 2. The March and April 2015 account hold and withdrawal

Wilson argues that prison officials violated his "clearly established" rights by placing a hold on his inmate account until they could withdraw later-deposited VA funds. He points to a Ninth Circuit decision[12] that purportedly placed prison officials on notice that his written agreement to pay for the medical copies out of his inmate account was an unenforceable "assignment" of VA benefits, and that subsequently withdrawing the VA funds to pay for his medical copies was a prohibited "seizure" under § 5301.

We turn first to Wilson's argument that his instruction to prison officials to bill his nearly empty inmate account was an unenforceable "assignment" of VA funds. The text of § 5301(a)(1)

---

[12] *See Nelson v. Heiss*, 271 F.3d 891 (9th Cir. 2001).

says that the "[p]ayments of benefits due or to become due . . . shall not be *assignable*." (Emphasis added). A later subprovision "clarif[ies]" that a prohibited assignment is "an agreement with another person under which agreement such other person acquires for consideration the right to receive such benefit by payment of such compensation, pension, or dependency and indemnity compensation," including by "deposit into a joint account from which such other person may make withdrawals." § 5301(a)(3)(A).[13] Accordingly, the kind of "assignment" prohibited

---

[13] We note, in passing, that the plain meaning of another subprovision, § 5301(a)(3)(B), which provides an exception to the general prohibition on assignment, is consistent with our reading of the statute. Section 5301(a)(3)(B) says "nothing in this paragraph is intended to prohibit a loan involving a beneficiary *under the terms of which the beneficiary may use the benefit to repay such other person*" as long as the beneficiary repays the loan through separately executed periodic payments or a preauthorized electronic funds transfer ("EFT"). § 5301(a)(3)(A) (emphasis added). Far from simply clarifying that veterans may use their benefits to repay a loan, this subprovision exempts a certain type of agreement that would otherwise be prohibited by the statute because it identifies and transfers the right to future VA payments: loan agreements "under the terms of which" the beneficiary is entitled to use VA funds to repay the loan. § 5301(a)(3)(B).

The dissent appears to read § 5301(a)(3)(B)'s exception differently. According to the dissent, Congress provided this exception to "allow[] veterans to use electronic funds transfers to send loan payments" generally. And so, the dissent argues, because "an EFT transaction draws from the sender's bank account regardless of the source of those funds, [§ 5301(a)(3)(B)] would be unnecessary if the statute only banned agreements that mention VA funds." The dissent argues, therefore, that we should not "carve a new exception out of § 5301" for agreements that make no mention of VA benefits at all. But § 5301(a)(3)(B)'s reference to EFT relates solely to making payments pursuant

by the statute is an assignment of "*the right to receive*" VA benefits.[14] *Id.* (emphasis supplied).

---

to the exception discussed in the preceding paragraph, *i.e.*, a loan agreement "under the terms of which" the beneficiary may use VA funds to repay the lender. It is not a freestanding provision permitting veterans to make EFT payments generally. Rather, as explained above, pursuant to § 5301(a)(3)(B), a veteran has two repayment options under the loan agreement exception contained in § 5301(a)(3)(A): execute separate agreements for each periodic payment or repay the loan through a preauthorized EFT. § 5301(a)(3)(B). The dissent is correct that an EFT payment draws funds from the sender's account regardless of the source of those funds, but the EFT payments contemplated by this statutory exception occur only as part of a loan agreement "under the terms of which" a veteran agreed to repay the loan with future VA benefits.

[14] That an assignment necessarily involves the transfer of an identifiable right—in this case the right to receive future VA benefits—to another person is confirmed by the Restatement of Contracts. The Restatement says that "an assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance," and requires that "the obligee manifest an intention to transfer the right to another person." Restatement (Second) of Contracts §§ 317(1), 324. As both § 5301 and the Restatement make clear, an assignment requires a manifestation of the intent to transfer a right—in this case the right to receive VA benefits "due or to become due"—to another person. So, contrary to our dissenting colleague's assertion otherwise, we are not inventing an exception for "vaguely worded assignments." The consent form Wilson signed did not mention VA benefits nor did it evince Wilson's intent to transfer his right to them to anyone. Indeed, it is difficult to see how a consent agreement containing no mention of VA benefits could "manifest [Wilson's] intention to transfer" his right to such benefits to the defendants. The words "VA benefits" are not "magic" at all, as the dissent correctly contends. Rather, where it is not evident from the four corners of an agreement, such as the one at issue in this case, that a veteran intends to assign his right to future VA benefits to

The agreement Wilson signed instructing prison officials to "bill [his] inmate bank account" for copies of the mental health records he had requested was not an assignment prohibited by § 5301. Wilson did not, in any way, assign his VA benefits within the meaning of the statute, having never made an "agreement" under which the prison officials "acquire[d] for consideration the right to receive . . . by payment," his VA benefits. *See* § 5301(a)(1)(A). The consent form made no mention of VA benefits at all. Nor did it mention the possibility of officials placing a "hold" on Wilson's account if the funds were insufficient. Far from an assignment of VA benefits, this agreement merely indicated Wilson's consent to prison officials billing his inmate account to pay for the copies he requested, thereby authorizing the prison to take $37.95 from Wilson's inmate bank account, without consideration of how those funds got there in the first place. The form gave Wilson two options to pay for the medical copies, stating, "[y]our inmate bank account can be billed for these charges or a bill can be sent to your family requesting payment. Please check the box below to let us know how you will pay for the copy." Wilson checked the box labeled "[b]ill my inmate account." Such an agreement—one that does not mention VA benefits nor indicate

---

another, we decline to deem such an agreement an unlawful assignment. For that reason, and for the reasons articulated above, Wilson's voluntary agreement to pay for his mental health records from his inmate bank account, was simply not a prohibited assignment of VA benefits under § 5301, despite the fact that the account was funded in part by Wilson's VA benefits.

18-11842                Opinion of the Court                23

any intent to transfer Wilson's right to them to anyone—is not a prohibited assignment of VA benefits under § 5301.

We turn next to Wilson's argument that the defendants—either the prison officials or Corizon Health—unlawfully "seized" his VA benefits by transferring $37.95 from his account to Corizon Health when the VA funds arrived. This argument likewise fails. Section 5301(a)(1) states that VA benefits "shall not be liable to attachment, levy, or *seizure* by or under any legal or equitable process whatever." (Emphasis added). Although the statute does not define "seizure," in 1935 (when Congress added the word to the statute protecting VA benefits),[15] "seizure" meant the "[a]ct of seizing, or state of being seized," and "seize" meant, among other things, "[t]o take possession of, or appropriate, in order to subject to the force or operation of a warrant, order of court, or other legal process." *Webster's New International Dictionary of the English Language* 2268 (2d ed. 1935).

When $37.95 was debited from Wilson's account to pay for his medical copies, the defendants were merely carrying out Wilson's instruction as embodied in the February 2015 authorization form. In that agreement, Wilson authorized officials to bill his account, and when sufficient funds existed in the account, prison officials did just that. Acting on an agreement to pay a specified sum (*i.e.,* $37.95) by a specific means (*i.e.,* "bill my inmate account") surely is not a "seizure" within the meaning of

---

[15] Act of Aug. 12, 1935, Pub. L. No. 74-262, § 3, 510 Stat. 607, 609.

24                    Opinion of the Court                    18-11842

§ 5301(a)(1).    Wilson's only response on this front is that his authorization to "bill [his] inmate account" was an unenforceable assignment under § 5301.    But as discussed previously, Wilson's authorization was *not* an assignment of VA benefits under § 5301. So the defendants did not seize Wilson's funds when they withdrew $37.95 from his account.

Wilson has therefore failed to show that the defendants violated his rights under § 5301 for the March and April 2015 hold and debit.    Accordingly, the officials are entitled to qualified immunity.

In the alternative, assuming *arguendo* that the consent form was an unenforceable assignment of VA benefits, Wilson has failed to show that a decision from the Supreme Court, our Court, or the Florida Supreme Court put officials on notice of his "clearly established" rights under § 5301.[16]    *See Echols*, 913 F.3d at 1324.

---

[16] If the hold placed on Wilson's account and the prison official's subsequent withdrawal of funds did not constitute a prohibited assignment or seizure under § 5301, we need not decide whether the district court properly dismissed Corizon Health as a defendant.    Wilson's only allegations against Corizon Health stem from the account hold and debit, which, as a matter of law, did not violate § 5301.

We note, however, that under our alternative reasoning—that the prison officials are entitled to qualified immunity because Wilson has failed to show the violation of a "clearly established" right—we must address whether the district court erred in dismissing Corizon Health because private contractors are generally not entitled to the protections of qualified immunity.    *See, e.g.,*

18-11842                Opinion of the Court                25

Wilson argues that officials were on notice because a district court in our Circuit, in an unrelated case, cited the Ninth Circuit's 2001 decision in *Nelson v. Heiss*.  *See Purvis v. Crosby*, 2006 WL 1836034, at \*8 (N.D. Fla. June 30, 2016) (citing *Nelson v. Heiss*, 271 F.3d 891 (9th Cir. 2001)).  In *Nelson*, our sister circuit held that prison officials violated § 5301 when, after an inmate authorized

---

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (declining to extend qualified immunity to a privately employed prison physician).

But even under this reasoning, the district court did not err in granting Corizon Health's motion to dismiss for failure to state a claim.  We review de novo a Rule 12(b)(6) dismissal of a complaint for failure to state a claim.  See *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).  For a claim to survive a motion to dismiss for failure to state a claim, the plaintiff's allegations "'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In assessing the plausibility of a claim, we may also consider exhibits attached to and referenced in the complaint.  See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

In his amended, *pro se* complaint Wilson alleged that "Corizon Health Care seized §5301(a)" VA benefits "that are federally and state protected from seizure," citing "Exhibit C" in support of his claim.  Exhibit C of Wilson's amended complaint is a copy of the account statement covering the hold and subsequent debit of $37.95 from his inmate account.  It lists "Corizon Health" as the "payee" for the $37.95 debited from Wilson's account.  This exhibit merely shows that Corizon Health received the payment.  It does not demonstrate that Corizon Health actually seized the funds, had any access to Wilson's inmate account, or did anything beyond passively receiving money.  Therefore, Wilson has failed to state a plausible claim that Corizon Health "seized" his VA benefits.  See *Iqbal*, 556 U.S. at 678.

26                        Opinion of the Court                    18-11842

the prison to withdraw money from his account, prison officials placed a hold on his account due to insufficient funds and subsequently withdrew the overdrawn amount from the inmate's VA benefits. *See Nelson*, 271 F.3d at 895. The prison officials argued that they did not violate the statute because the inmate consented to the withdrawal of funds. The Ninth Circuit rejected this argument, concluding that "consent to a taking of future benefits" is an invalid assignment under § 5301. *Id.* The Ninth Circuit granted qualified immunity to the prison officials, however, because, given the inmate's consent to the hold, a reasonable official might have thought taking the later-received funds did not violate the statute. *Id.* at 896–97.

Although *Nelson* involved a similar factual scenario to this case, it is not a decision from the Supreme Court, our Court, or the Florida Supreme Court and is therefore insufficient to place prison officials on notice that the hold and withdrawal violated Wilson's "clearly established" rights. The fact that a district court in our Circuit cited *Nelson* is irrelevant. *See Echols*, 913 F.3d at 1324. Accordingly, the officials are entitled to qualified immunity.[17]

---

[17] Because we conclude that the state officials are entitled to qualified immunity, we need not reach two additional issues raised on appeal: (1) whether the prison warden was vicariously liable for the actions of the other prison officials and (2) which of Wilson's claims in connection with the credit union transfer and liens fall within the four-year statute of limitations. First, we need not decide whether the warden is vicariously liable because she would be entitled to qualified immunity even if she was subjected to supervisor liability. Second, it is irrelevant which liens fall within the statute

### (b) Standing

We now consider whether the district court erred in granting summary judgment to the Secretary as to Wilson's claim that Florida's Direct Deposit Rule violates § 5301 and the Supremacy Clause. The district court found that Wilson lacked standing to challenge the rule because he did not allege a "sufficient likelihood that he will suffer injury" from complying with the rule in the future. Florida's Direct Deposit Rule provides that

> [i]n accordance with 38 U.S.C. [§] 5301, Veterans Administration (VA) benefit checks are exempt from attachment, levy or seizure. The Department shall not deduct payments for liens on the inmate's trust fund account for medical co-payments, legal copies, or other Department generated liens from VA benefits checks *mailed directly to the Bureau of Finance and Accounting, Inmate Trust Fund Section, Centerville Station, P.O. Box 12100, Tallahassee, FL 32317-2100.*

Fla. Admin. Code Ann. r. 33-203.201(2)(b) (emphasis added). Consequently, under this rule, Florida will respect the protected status of VA benefits pursuant to § 5301 only if the funds are sent directly to an inmate account.

We review the grant or denial of summary judgment *de novo*, "applying the same legal standards used by the district

---

of limitations period because the defendants are entitled to qualified immunity as to all of them.

court." *Yarbrough v. Decatur Housing Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019). And when standing is raised in a motion for summary judgment, "the plaintiff[] can no longer rest on their allegations, but must set forth by affidavit or other evidence specific facts which for the purpose of summary judgment will be taken as true." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1427 (11th Cir. 1998) (quotation omitted).

Wilson argues that he has standing to challenge the Florida Direct Deposit Rule because he sufficiently alleged a threat of future harm from having to keep separate addresses for VA benefits and VA correspondence in his opposition to summary judgment. Wilson claimed that after changing his address, he was late in receiving several VA benefits checks. He attached an account statement reflecting that he missed at least two payments in April and May 2013. Wilson now claims that because he is forced to keep two addresses, it is "inevitable" that he will miss a VA benefit check or important correspondence in the future.

The Florida officials respond that there is no real immediate threat of future injury to Wilson because Wilson's VA benefits are sent directly to the DOC, so "[t]here have been no issues or complaints for approximately seven years."

A party has standing to sue for injunctive relief "where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Accordingly, Wilson must show a "real or immediate threat that [Wilson] will be wronged again," or, in other words, a "'likelihood of substantial and immediate irreparable

injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974)). Accordingly, the threat of injury, to suffice for prospective relief, must be imminent. *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (noting the Court's insistence that "the injury proceed with a high degree of immediacy" to establish standing to seek prospective relief).

Wilson lacks standing because he has failed to show a "real" and "immediate" threat of future injury from complying with the Florida Direct Deposit Rule, pointing only to injuries in the distant past. Although it appears that Wilson initially suffered concrete harm when he transitioned to keeping two addresses on file with the VA (*i.e.*, receiving VA checks several months late in the spring of 2013), that harm occurred only in the immediate aftermath of the address change—over nine years ago. Wilson tells us that it is "inevitable" that he will miss VA correspondence and benefit checks in the future—despite nine years of complying with the direct deposit rule without issue—but he says little else on the matter. In cases where a plaintiff seeks injunctive relief, pointing only to past injuries and speculating that such harm will "inevitabl[y]" occur again is insufficient to establish standing. *See Lyons*, 461 U.S. at 102 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (quotation omitted)); *Bowen v. First Fam. Fin. Servs., Inc.*,

233 F.3d 1331, 1340 (11th Cir. 2000) (holding that a "perhaps or maybe chance" of future harm is "not enough" to establish standing for a claim seeking injunctive relief from an arbitration agreement (quotation omitted)). Because Wilson has not shown a "real or immediate threat" of future injury from keeping two addresses to comply with the Florida's administrative rule, he lacks standing to challenge it. *See Lyons*, 461 U.S. at 111.

**AFFIRMED.**

18-11842    GRANT, J., Concurring in part and dissenting in part    1

GRANT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the prison officials who executed the pre-August 2012 liens are entitled to qualified immunity. The checks from Wilson's personal bank account (though made up of VA funds) gave "no indication that VA benefits were included." Op. at 16. And we must confine the qualified immunity "inquiry to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct at issue." Op. at 13 (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)). For purposes of § 1983, then, we consider only what the officials knew about the checks when they received them—that they were personal checks. Because the officials were not aware that they were handling VA benefit money, they are entitled to qualified immunity.

Still, I respectfully disagree that 38 U.S.C. § 5301 did not protect those funds in the first place. *See* Op. at 14–19. Facially nondescript bank deposits made up of VA funds are exempt under § 5301. *Lawrence v. Shaw*, 300 U.S. 245, 250 (1937). In *Lawrence v. Shaw*, where the Supreme Court established this rule, a veteran's VA funds had been deposited into his bank account labeled only as "deposits in bank." *Id.* at 247. The missing VA identifier did not strip the funds of their exempt status. *Id.* at 250. So too here.

The majority says this case is different because Wilson's personal-check deposits involved another step, one the Supreme Court has never addressed—a transfer between two bank accounts. Op. at 16–17. But all that transfer did was make the VA funds

2    GRANT, J., Concurring in part and dissenting in part    18-11842

nondescript, reducing them from labeled VA funds to "deposits in bank"—just like in *Lawrence*. Labeling does not matter—the rule is that however VA funds are stored, they are protected if they remain "subject to demand and use as the needs of the veteran for support and maintenance require[]." *Porter v. Aetna Cas. & Sur. Co.*, 370 U.S. 159, 160–61 (1962). I see no reason that Wilson's benefits would not be protected by § 5301 simply because he transferred them to a new account.

I must also respectfully disagree with the majority's conclusion that veterans can sign away VA funds through consent forms like the one Wilson used here. Op. at 22–23. Section 5301 prohibits nearly all assignments of future VA benefits, including any agreement where a veteran relinquishes his "right to receive" VA benefits. 38 U.S.C. § 5301(a)(1), (a)(3)(A). The consent form here is plainly an assignment. Wilson signed over $37.95 from his inmate account—a commitment that included future deposits of VA funds. Prison officials treated the agreement as an assignment, and the Ninth Circuit has also held that this exact kind of inmate agreement is an unlawful assignment. *See Nelson v. Heiss*, 271 F.3d 891, 895 (9th Cir. 2001).

The opinion appears to hold that § 5301 applies only to agreements that use magic words like "VA benefits." Op. at 23. If this interpretation is correct, § 5301 is impotent—any assignment of VA benefits can easily be written with general language. I would not carve a new exception out of § 5301 for artfully drafted assignments of future VA benefits.

18-11842    GRANT, J., Concurring in part and dissenting in part    3

In my view, the only straightforward reading is that the statute bans agreements exchanging a specific kind of consideration: future VA benefits. "Payments of benefits," § 5301(a)(1) says, "shall not be assignable." Only veterans may spend these funds—they are also exempt from taxation, creditors' claims, attachment, and seizure. 38 U.S.C. § 5301(a)(1). None of those prohibitions consider wording or phrasing; they broadly target acts that deprive a veteran of her benefits. The same is true for assignment of future VA benefits.

And "if Congress wanted to create exceptions" to § 5301, "it knew how to do so. In fact, it did provide for some." *Nelson*, 271 F.3d at 896. Section 5301(a)(3)(B), for example, allows veterans to use electronic funds transfers to send loan payments. When a veteran authorizes an EFT, he permits a company to automatically withdraw money from his bank account. *See* 15 U.S.C. §§ 1693a(7), (10). Given that an EFT transaction draws from the sender's bank account regardless of the source of those funds, this exception would be unnecessary if the statute only banned agreements that mention VA funds. In contrast, an exception for vaguely worded assignments is nowhere to be found.

★    ★    ★

I concur with much of the majority's opinion. But I part ways on these two important points. We should not deprive veterans of the protections Congress provides them. It has long been established that VA funds are protected by § 5301 even if they are not so labeled. And any agreement by which a veteran signs

4    GRANT, J., Concurring in part and dissenting in part    18-11842

away future VA benefits is prohibited by § 5301.  On these grounds, I respectfully dissent.