[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-12243

Non-Argument Calendar

_____

DR. DARE ADEWUMI,

Plaintiff-Appellant,

*versus*

WELLSTAR MEDICAL GROUP AND
WELLSTAR HEALTH SYSTEMS, INC.,

Defendants-Appellees,

NORTHSIDE HOSPITAL, INC.,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04048-CAP

_____

Before JILL PRYOR, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

Dr. Dare Adewumi appeals the district court's grant of summary judgment in favor of his former employers Wellstar Medical Group, LLC and Wellstar Health Systems, Inc. (collectively "the Wellstar defendants" or "Wellstar") on his race discrimination claim under 42 U.S.C. § 1981. After review, we affirm.

## I.  FACTUAL BACKGROUND

The report and recommendation ("R&R"), adopted by the district court, thoroughly reviewed the summary judgment facts, the procedural history, and the applicable legal principles in this case. Because we write only for the benefit of the parties, we discuss only the facts and procedural history necessary to explain the context of our decision.

### A.    2018 Hiring

In March 2018, Dr. Adewumi, who is African American, began working as the sole neurosurgeon at Wellstar Cobb Hospital, one of Wellstar's hospitals. Dr. Adewumi was hired to

restart the neurosurgery service line at Cobb Hospital, which had been defunct for twenty years.

Dr. William Benedict, the practice lead of Wellstar Medical Group's neurosurgery practice group, interviewed Dr. Adewumi for the position. Dr. Benedict worked at Kennestone Regional Medical Center, another of the Wellstar defendants' affiliate hospitals. Dr. Benedict reported to Dr. Alan Muster, the Senior Vice President of Wellstar Medical Group's specialty division, who oversaw all surgeons and medical specialists and was the final decisionmaker for hiring and firing physicians within the specialty groups. Dr. Benedict recommended to Dr. Muster that Dr. Adewumi be hired.

## B.     Peer Review Process

Beginning in late 2018 and into 2019, some of Dr. Adewumi's cases were referred to a peer review process conducted by Cobb Hospital's surgery Medical Executive Committee ("MEC"). Dr. Benedict was not a member of the MEC and did not vote on any of the MEC's final determinations. However, because there was no other neurosurgeon at Cobb Hospital to perform a peer review, Dr. Benedict was asked to review Dr. Adewumi's cases and give guidance to the MEC. In some cases, the MEC found Dr. Adewumi's care to be "appropriate," but in other cases, the MEC found Dr. Adewumi's care to be either "appropriate with opportunity for improvement" or "inappropriate." With Dr. Benedict's support, the MEC also referred for external review

several cases in which Dr. Adewumi's care was deemed inappropriate.

Dr. Adewumi came to believe Dr. Benedict did not like him and had "weaponized" the peer review process to damage his career. According to Dr. Adewumi, Dr. Benedict criticized and belittled him in a condescending manner, questioned his competency, called him callous, uncaring, arrogant, and lazy, and suggested Dr. Adewumi needed remediation. Dr. Benedict also made disparaging remarks to Dr. Adewumi about two other African-American neurosurgeons, Dr. Kenneth Hill and Dr. Paul King, who had worked for Wellstar, criticizing their surgical skill and medical knowledge and suggesting they should not have been employed.

## C.    Dr. Adewumi's Complaints

Between March and June 2019, Dr. Adewumi complained to Dr. Muster "multiple times" about Dr. Benedict's treatment of him. Specifically, Dr. Adewumi advised that "Dr. Benedict did not like [him], and [he] did not know why [Dr. Benedict] did not like [him]." Dr. Adewumi told Dr. Muster that Dr. Benedict also "did not like" Dr. Hill and Dr. King, but Dr. Adewumi "was afraid to be too direct because [he] did not want to jeopardize [his] job."

Dr. Adewumi also expressed concerns to Dr. Muster about the MEC peer review process and that Dr. Benedict was biased against him and "was out to damage [his] career." Dr. Adewumi complained to Dr. Muster and others in Wellstar's "leadership" that Dr. Benedict was targeting him and trying to end his career,

but Dr. Adewumi admitted that he was "afraid to bring up race" in these conversations with "white superiors" because he was "afraid of being accused of using a race card" and "afraid of further retaliation." After one such conversation on April 4, 2019, Dr. Muster emailed Dr. Benedict, advising him that Dr. Adewumi "feels you may have already determined that he is not going to succeed and are biased against him."

### D.     Formal Action Plan

In July 2019, the MEC decided to place Dr. Adewumi on a formal action plan. The proposed action plan (1) called for Dr. Adewumi to work for 4.5 months at Kennestone Hospital under the supervised mentorship of other neurosurgeons in the practice group, and (2) thereafter Dr. Adewumi could return to Cobb Hospital and the MEC would conduct a focused review of his cases there for the next twelve months. Under the action plan, Dr. Adewumi would "take call" and perform surgeries in partnership with other Kennestone-based neurosurgeons in a "buddy system." The intent was to immerse Dr. Adewumi in the "processes at Kennestone" so that he could learn from them and bring them back to Cobb Hospital.

Because the MEC's action plan would need the neurosurgery team's support, the MEC consulted Dr. Muster, who in turn sought Dr. Benedict's input, before the action plan was presented to Dr. Adewumi. After a July 9, 2019 meeting with Dr. Muster and the Kennestone-based neurosurgeons tasked with

mentoring him, Dr. Adewumi signed the action plan on July 17, 2019.

### E.    Neurosurgeons at Kennestone Hospital

Once Dr. Adewumi was on the action plan, other neurosurgeons in the practice expressed concerns to Dr. Benedict about the burden that the action plan placed on them while they also had to manage their own caseloads at Kennestone Hospital, a Level 2 trauma center.[1]   Some neurosurgeons also said they believed Dr. Adewumi was merely "checking the boxes" to complete the action plan and not internalizing the learning the plan was meant to instill.

Dr. Benedict relayed these concerns about the strain on the Kennestone neurosurgery team to Dr. Muster, explaining it was causing disruption to the team, who felt they were more invested in Dr. Adewumi's success than Dr. Adewumi was.  In fall 2019, Dr. Benedict recommended to Dr. Muster that Dr. Adewumi be terminated.

Dr. Muster said that some of the neurosurgeons at Kennestone Hospital indicated to him that they did not feel they could continue to support the action plan.  Dr. Muster was concerned that Wellstar "could lose one or more [of] the neurosurgeons if [they] continued with this path."  Dr. Muster

---

[1] At the time, Kennestone Hospital was the busiest hospital in the Wellstar system, "with the highest acuity patients."  And the volume of cases "per doctor" was higher at Kennestone than at Cobb Hospital.

decided to terminate Dr. Adewumi because the action plan was putting too much strain on the already heavily burdened neurosurgery practice at Kennestone Hospital.

## F.    Termination

On October 8, 2019, Dr. Muster and the Human Resources Vice President met with Dr. Adewumi and terminated him "without cause" pursuant to the terms of his employment contract. Dr. Muster told Dr. Adewumi that his termination was because the action plan put too much strain on the neurosurgery group at Kennestone Hospital and that his termination was not based on any non-compliance with the action plan. Dr. Muster also suggested that Dr. Adewumi had not fostered relationships that should have been fostered.

In the fall of 2021, Dr. Marcus Gates, who is African American, began working for Wellstar Medical Group as a neurosurgeon at Cobb Hospital. In July 2022, Dr. Gates was joined by Dr. Saint-Aaron Morris, another African-American neurosurgeon, at Cobb Hospital.

## II.  DEFENDANTS' SUMMARY JUDGMENT MOTION

On September 21, 2023, the Wellstar defendants filed a motion for summary judgment, a brief in support, and a separate statement of undisputed material facts, as required by Northern District of Georgia Local Rule 56.1(B)(1).

Dr. Adewumi filed a brief and a separate response to *Wellstar's* statement of undisputed material facts, admitting some

facts and denying others.  But Dr. Adewumi did not file *his own* separate statement of additional facts that he contended were material and created a genuine issue for trial, as required by Local Rule 56.1(B)(2)(a)(4).

Dr. Adewumi did file a 47-page declaration that outlined his version of events—sometimes with citations to the depositions of Dr. Muster and Dr. Benedict—and also alleged additional facts.  Dr. Adewumi's declaration also disputed various statements in affidavits that Wellstar submitted in support of summary judgment.  In addition, Dr. Adewumi filed a declaration of Dr. Paul King, a retired African-American neurosurgeon who had worked at Atlanta Medical Center, another Wellstar hospital.  Both Dr. Adewumi's summary judgment brief and his separate response to *Wellstar's* statement of undisputed material facts relied upon his and Dr. King's declarations to refute Wellstar's facts and support his additional facts.

### III.  MAGISTRATE JUDGE'S R&R

As a threshold matter, the R&R, adopted by the district court, declined to consider the facts set forth in Dr. Adewumi's and Dr. King's declarations for two reasons.  First, and primarily, the R&R concluded that these facts were "not properly before the Court" because, although they were cited in Dr. Adewumi's response brief, none of them "were included in a separate statement of additional facts as required by [Local Rule] 56.1(B)(1)(d) and (2)(b)."  The R&R cited several other district court decisions in the Northern District of Georgia likewise refusing to

consider facts stated in a declaration or affidavit but not incorporated into a statement of material facts as required by Northern District of Georgia's Local Rule 56.1.

Second, and in a footnote, the R&R concluded that Dr. Adewumi's and Dr. King's declarations were "unsworn and fail to comply with the requirements of 28 U.S.C. § 1746. The R&R stressed that these two declarations (1) did not contain the precise language required by § 1746; (2) did not declare that the statements were "true and correct"; and (3) were not sworn, "i.e., sworn under oath before a notary or other oath-taker as shown by a notary signature and seal, in spite of the assertion that the declarant was 'duly sworn.'"

On the merits, the R&R recommended granting summary judgment to the Wellstar defendants, concluding that Dr. Adewumi had failed to present sufficient evidence to create a triable issue of fact as to whether he was terminated because of his race under either the *McDonnell Douglas*[2] burden-shifting framework or the alternative "convincing mosaic" approach.

Dr. Adewumi filed multiple objections to the R&R. In a 30-page order, after reviewing the summary judgment facts, the district court overruled Dr. Adewumi's objections and adopted the R&R. Among other things, the district court ruled that the magistrate judge properly disregarded Dr. Adewumi's and Dr. King's declarations.

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

## IV.  STANDARD OF REVIEW

We review a district court's application of its local rules for abuse of discretion.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009).  Likewise, we review a district court's evidentiary rulings at summary judgment for abuse of discretion.  *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 910 (11th Cir. 2012).

We review *de novo* a district court's order granting summary judgment, viewing all evidence and drawing all inferences in favor of the non-moving party.  *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).  Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## V.  TWO DECLARATIONS

For the following reasons, the district court did not abuse its discretion in declining to consider the declarations of Dr. King and Dr. Adewumi.

### A.    Dr. King's Declaration

Dr. King's declaration, which is unsworn, does not comply with the requirements of § 1746.  For an unsworn declaration executed in the United States to have the same force and effect as a sworn declaration, § 1746(2) provides that the unsworn declaration must be "subscribed by [the declarant], as true under penalty of perjury, and dated, in substantially the following form: . . 'I declare (or certify, verify, or state) under penalty of

perjury that the foregoing is true and correct.  Executed on (date).  (Signature)'." 28 U.S.C. § 1746(2).  Dr. King's declaration omits any statement declaring that its contents are "true and correct," and thus does not satisfy all of § 1746(2)'s requirements.  As such, Dr. King's unsworn declaration does not constitute competent summary judgment evidence.  *See Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (explaining § 1746 provides a statutory exception to the general rule that unsworn statements may not be considered for summary judgment purposes).

## B.    Dr. Adewumi's Declaration

Dr. Adewumi's declaration does not precisely track the declaratory language set out in § 1746(2).  However, the declaration's preamble does state that Dr. Adewumi "hereby declares under the pains and penalties of perjury" and then the first numbered statement after the preamble further "declare[s] that the statements made herein are true . . . ."

We need not decide whether Dr. Adewumi's declaration substantially complies with § 1746(2), however, because even assuming it does, we still must affirm the district court's declining to consider the facts contained in Dr. Adewumi's declaration.  The district court declined to consider those facts because in responding to summary judgment, Dr. Adewumi failed to comply with Local Rule 56.1(B)(2).

More specifically, Local Rule 56.1(B)(1)(d) provides that the district court "will not consider a fact . . . set out only in the brief and not in the movant's statement of undisputed facts."  Local Rule

56.1(B)(2)(a) requires the respondent to a summary judgment motion to include with his responsive brief a "response to the movant's statement of facts." In addition, Local Rule 56.1(B)(2)(b) requires a "statement of additional facts which the respondent contends are material and present a genuine issue for trial." Local Rule 56.1(B)(2)(b) further states that the respondent's "separate statement of material facts must meet the requirements set out in LR 56.1(B)(1)."

As the adopted R&R explained, district courts in the Northern District of Georgia long have interpreted Local Rule 56.1(B)(2)(b) to prohibit the court from considering a fact in the respondent's responsive brief that is not also found in the respondent's separate statement of additional facts. *See, e.g.*, *Ghertner v. Corp. Env'ts of Ga., Inc.*, 2020 WL 4551269, at *2 (N.D. Ga. June 26, 2020) (reviewing cases), *adopted by* 2020 WL 4577709 (N.D. Ga. July 31, 2020). We afford great deference to a district court's interpretation of its local rules. *Mann*, 588 F.3d at 1302. We have said that the Northern District of Georgia's Local Rule 56.1 "protects judicial resources by making the parties organize the evidence rather than leaving the burden upon the district judge" and "streamlines the resolution of summary judgment motions by focusing the district court's attention on what is, and what is not, genuinely controverted." *Reese v. Herbert*, 527 F.3d 1253, 1268-69 (11th Cir. 2008) (quotation marks and alterations omitted) (rejecting an argument that Local Rule 56.1(B)(2)(a)(2) conflicts with Federal Rule of Civil Procedure 56).

24-12243              Opinion of the Court              13

Here, Dr. Adewumi offers no argument on appeal as to (1) why we should not defer to the district court's interpretation of Rule 56.1(B)(2)(b), or (2) how the district court's application of Rule 56.1(B)(2)(b) to Dr. Adewumi—who was (and still is) represented by counsel—amounted to an abuse of discretion. Indeed, Dr. Adewumi's opening appeal brief does not even acknowledge his failure to comply with Rule 56.1(B)(2)(b) in the district court.[3] Thus, Dr. Adewumi has abandoned any argument on appeal as to Rule 56.1(B)(2)(b), and we must affirm the district court's decision to disregard the facts in his declaration on this ground. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed.").

We now turn to the merits of the summary judgment order.

## VI.  GENERAL PRINCIPLES

Dr. Adewumi claims that the Wellstar defendants terminated him based on his race, in violation of 42 U.S.C. § 1981.[4]

---

[3] We find no merit to Dr. Adewumi's suggestion in his reply brief that his "extensive response to each of the contested facts set forth in [Wellstar's] Rule 56.1 statement," which was required by Local Rule 56.1(B)(2)(a), was also sufficient to comply with his separate obligations under Rule 56.1(B)(2)(b).

[4] In a prior order granting in part the defendants' motion to dismiss, the district court concluded that Dr. Adewumi's placement on an action plan was not an adverse employment action but could be considered in conjunction with Dr.

Under § 1981, intentional race discrimination is prohibited in employment contracts. *Jenkins*, 26 F.4th at 1249. Employment discrimination claims under § 1981 are analyzed using the same legal framework as disparate treatment claims under Title VII of the Civil Rights Act of 1964. *Id*. At summary judgment, there are two paths an employment discrimination plaintiff can take to survive summary judgment—the *McDonnell Douglas* burden-shifting framework or the "convincing mosaic" approach. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024). We discuss each below.

### A.    *McDonnell Douglas - Prima Facie* Case

Under *McDonnell Douglas*, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*). To make out a *prima facie* case of discrimination, a plaintiff must show: (1) that he belongs to a protected class; (2) that he was subjected to an adverse employment action; (3) that he was qualified to perform the job in question; and (4) that he was treated less favorably by his employer than "similarly situated" employees outside the protected class. *Id*. at 1220-21.

The district court correctly concluded, under the *McDonnell Douglas* framework, that Dr. Adewumi satisfied the first three

---

Adewumi's termination as a pretextual justification for his termination. Dr. Adewumi does not challenge this determination on appeal.

prongs of a *prima facia* case of race discrimination but failed to establish a proper comparator for purposes of the fourth prong.

To establish the fourth prong, the plaintiff must present evidence of a comparator who is "similarly situated in all material respects." *Jenkins*, 26 F.4th at 1249. What is a "material" similarity or difference will vary from case to case, but ordinarily a similarly situated comparator and the plaintiff will "have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Id.*

Dr. Adewumi identified as a comparator Dr. Phil Parry, a white neurosurgeon in the practice group.[5] Dr. Adewumi testified that "Dr. Parry was involved" with "a deviation from the standard of care" that resulted in complications and that, unlike with Dr. Adewumi's complications, "Dr. Benedict did not discuss it in conference" or "bring it up at all."

This comparator evidence is insufficient for several reasons. For starters, Wellstar did not terminate Dr. Adewumi's employment because of concerns about his deviations from the standard of care, but because his action plan placed too great a strain on the rest of his practice group. To be a proper comparator and give rise to a presumption of discrimination, Dr. Parry needed

---

[5] Although Dr. Adewumi claimed his "white counterparts had cases that were clearly outside the standard of care" that were "swept under the rug," Dr. Parry was the only comparator Dr. Adewumi was able to identify.

to have been placed on a similar action plan—i.e., a buddy system that required other neurosurgeons in the practice group to "take call" and perform surgeries with him for several months—but was not terminated. *See id.* In fact, Dr. Adewumi acknowledged he did not "know the peer review status" of the neurosurgeons at Kennestone Hospital.

Additionally, even if we considered the different treatment of Dr. Adewumi's and Dr. Parry's deviations from the standard of care, this evidence does not establish that Dr. Parry is "similarly situated in all material respects." *See id.* Dr. Parry's single instance of deviating from the standard of care is not materially similar to Dr. Adewumi's twenty cases referred to the MEC for peer review, some of which led the MEC to issue letters of inquiry to Dr. Adewumi, make findings of inappropriate care, send some cases for external review, and ultimately to place Dr. Adewumi on an action plan. *See Lewis*, 918 F.3d at 1225, 1227-28 (explaining that a valid comparator will have engaged in "the same basic conduct (or misconduct)" and "will share the plaintiff's employment and disciplinary history").

## B.    Legitimate Nondiscriminatory Reason

Even assuming *arguendo* that Dr. Adewumi established a *prima facie* case, the burden shifted to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* at 1221. If the employer carries this intermediate burden of production, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful

discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that [the plaintiff] has been the victim of intentional discrimination." *Id.* (quotation marks omitted and alteration adopted).

Here, the Wellstar defendants carried their burden. Specifically, Dr. Muster terminated Dr. Adewumi's employment contract because the formal action plan placed too great a strain on the neurosurgery practice at Kennestone Hospital. In addition to the deposition testimony of Drs. Muster and Benedict, the Wellstar defendants submitted declarations from two members of the neurosurgery practice at Kennestone, Drs. Hsu and Parry, who supported Dr. Muster's reason for termination.

## C.    Pretext

A plaintiff proves pretext by showing that the defendant's proffered reason is so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find the reason unworthy of credence. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). If the defendant's proffered reason is one that would motivate a reasonable employer to take the adverse action, the plaintiff "must meet that reason head on and rebut it," and cannot prove pretext by merely recasting the defendant's reason or by arguing his own business judgment over that of the defendant's. *Id.* at 1265-66. The plaintiff must show both that the proffered reason was false and that discrimination was the true reason for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

The district court correctly concluded that Dr. Adewumi did not present circumstantial evidence that Wellstar's legitimate, nondiscriminatory reason for terminating him was pretextual. Although Dr. Adewumi testified that no one informed him that the action plan was placing a strain on his fellow neurosurgeons, that assertion does not refute his colleagues' statements, and Dr. Adewumi did not present any evidence that their statements were false.

Most of Dr. Adewumi's evidence attempts to show that Dr. Benedict's scrutiny and micromanagement of him through the peer review process was unwarranted and that he (Dr. Adewumi) was successfully implementing the action plan when he was terminated. But this evidence fails to address, much less rebut head on, the reason Dr. Muster gave for terminating Dr. Adewumi. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) (stating that "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it" to prove pretext).

Dr. Muster terminated Dr. Adewumi's employment because the MEC's action plan—to improve Dr. Adewumi's performance and medical care—placed too much strain on the rest of the neurosurgeons at Kennestone Hospital who had to "take call" and perform surgeries with Dr. Adewumi while also managing their own heavy caseloads and who felt that Dr. Adewumi was not as invested in the action plan as they were. Dr. Adewumi did not present any evidence that Dr. Muster did not

honestly believe that the MEC's action plan was placing too great a strain on them. *See Alvarez*, 610 F.3d at 1266 (explaining that "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head"). Notably, Drs. Hsu and Parry averred that on many occasions they shared their concerns about the strain being placed on the team with their colleagues, including Dr. Benedict.

Further, Dr. Adewumi did not present evidence that Dr. Muster harbored a racial animus, such as making derogatory comments about African Americans. Dr. Adewumi's testimony that Dr. Muster called him arrogant and uncaring and that Dr. Muster "did nothing" when Dr. Benedict called him "arrogant, lazy, callous, obnoxious" does not support an inference that Dr. Muster (or Dr. Benedict) harbored a racial animus.

Similarly, to the extent Dr. Adewumi relies on a cat's paw theory—that Dr. Benedict targeted him and Dr. Muster merely accepted "whatever Dr. Benedict told him about" Dr. Adewumi—he also did not present evidence that Dr. Benedict's actions were motivated by a racial animus. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (explaining that under a cat's paw theory of liability, the plaintiff must show that the decisionmaker followed the recommendation of another individual who was motivated by "discriminatory animus"). In the district court, Dr. Adewumi pointed to what he called an "indirect slur" by Dr. Benedict in which Dr. Benedict said he could never

travel to a Muslim country. Dr. Adewumi also highlighted that he heard Dr. Benedict criticize the medical skills of two other African-American surgeons who worked at Wellstar in the past, but there is no evidence that these criticisms were based on race either. These comments by Dr. Benedict, without more, do not support a reasonable inference of racial animus.

In any event, under a "cat's paw" theory, the plaintiff must show that the biased non-decisionmaker manipulated the decisionmaker into terminating him. *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999). It is not enough to show that the decisionmaker considered *accurate* information from the biased non-decisionmaker. *See id.* But at most that is what we have here. There is no evidence to suggest Dr. Benedict's report to Dr. Muster—that the Kennestone neurosurgery team was concerned about the strain placed on them by the action plan—was inaccurate. To the contrary, two neurosurgeons confirmed the accuracy of Dr. Benedict's report. Therefore, there is no evidence that Dr. Benedict manipulated Dr. Muster such that any racial bias Dr. Benedict might have harbored tainted Dr. Muster's decision.

## D.    Convincing Mosaic Evidence

Alternatively, under the "convincing mosaic" approach, a plaintiff still can survive summary judgment by presenting circumstantial evidence that would permit a reasonable jury to infer intentional discrimination. *Jenkins*, 26 F.4th at 1250. "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing,

ambiguous statements, or other information from which discriminatory intent might be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* (quotation marks omitted).

We agree with the district court that Dr. Adewumi's circumstantial evidence, considered as a whole, was insufficient to survive summary judgment under the alternative "convincing mosaic" approach. Dr. Adewumi did not identify any suspicious timings, ambiguous statements, or other information from which discriminatory intent might reasonably be inferred, and as discussed above, he did not present evidence of pretext. *See id.*

On appeal, Dr. Adewumi argues that Dr. Benedict micromanaged him and subjected his medical errors to more scrutiny than his white colleagues. While evidence of "systematically better treatment of similarly situated employees" can support an inference of discriminatory intent, here Dr. Adewumi failed to present evidence of how his white counterparts within the practice group were managed or peer reviewed. *See id.* Although Dr. Adewumi testified that Dr. Benedict "buried" his white colleagues' complications, he was unable to identify any instances in which this happened apart from the single instance of Dr. Parry's deviation from the standard of care, which Dr. Benedict did not discuss in conference.

Dr. Adewumi also contends that the neurosurgery practice did not support him with "a rotation of neurosurgeons at Cobb [Hospital] from the beginning," "did nothing to assist him," and

then "turned on" him "after agreeing to provide mentorship through the action plan." This characterization of what happened is not supported by the record.

Dr. Adewumi accepted the position as the sole neurosurgeon at Cobb Hospital understanding that he was tasked with restarting the neurosurgery line there. Dr. Benedict testified that at the time the neurosurgery practice was "struggling to cover the call schedule at Kennestone, and separating a partner from Kennestone would have increased the call burden to the other partners, which was already severe." Once Cobb Hospital's MEC decided to place Dr. Adewumi on an action plan, his colleagues at Kennestone Hospital agreed to mentor him through a "buddy system" as part of the action plan, after which he would return to Cobb Hospital. Ultimately, however, the strain this "buddy system" placed on other neurosurgeons in the practice at Kennestone was too great and caused disruption within the team. These undisputed facts do not give rise to an inference of race discrimination.

## VII.  CONCLUSION

The district court did not abuse its discretion in declining to consider Dr. King's declaration and the facts in Dr. Adewumi's declaration. Further, the district court did not err in concluding that Dr. Adewumi's circumstantial evidence failed to establish race discrimination under the *McDonnell Douglas* framework and did not otherwise permit a reasonable inference of racially discriminatory intent under the convincing mosaic approach. Accordingly, we

affirm the entry of summary judgment in favor of the Wellstar defendants on Dr. Adewumi's § 1981 claim.

**AFFIRMED.**